Jeremiah Jackson appeals from the circuit court's denial of his petition for post-conviction relief, filed pursuant to Rule 32, Ala.R.Crim.P. On February 5, 1997, Jackson was convicted of capital murder for the killing of Vicki Carroll. The murder was made capital because it was committed during the course of a first-degree robbery. See § 13A-5-40(a)(2), Ala. Code 1975. The jury recommended, by a vote of 10-2, that Jackson be sentenced to death. The trial court accepted the jury's recommendation and sentenced Jackson to death. This Court affirmed Jackson's conviction on direct appeal. See Jacksonv. State, 791 So.2d 979 (Ala.Crim.App. 2000).
Jackson petitioned the Alabama Supreme Court for certiorari review. The Supreme Court denied Jackson's petition for the writ of certiorari, see Ex parte Jackson,791 So.2d 1043 (Ala. 2000), and this Court issued a certificate of judgment on November 3, 2000. Thereafter, Jackson petitioned the United States Supreme Court for certiorari review. On March 19, 2001, the United States Supreme Court denied Jackson's petition for the writ of certiorari. See Jackson v.Alabama, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311
(2001).
On March 4, 2002, Jackson filed a Rule 32 petition, challenging his capital-murder conviction and death sentence. Jackson filed an amendment to his Rule 32 petition on July 2, 2002, and on July 19, 2002, filed a second amendment to his petition. One *Page 152 
of the grounds for relief alleged in Jackson's initial Rule 32 petition was his assertion that he was mentally retarded and that execution of the mentally retarded was unconstitutional. Jackson's first and second amendments to his Rule 32 petition reiterated this claim, citing the then newly released decision by the United States Supreme Court in Atkins v.Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335
(2002),[1] prohibiting the execution of a mentally retarded defendant.
On January 9, 2004, the parties advised the circuit court that they had reached a stipulation regarding Jackson's claims. The parties advised the court that they were stipulating that Jackson met the definition of mentally retarded set out inAtkins v. Virginia, and, therefore, that Jackson's death sentence was due to be vacated and a sentence of life imprisonment without the possibility of parole imposed. The parties further agreed that in exchange for the State's stipulation that Jackson was mentally retarded, Jackson would forgo any additional appeals of his conviction and sentence.
On March 9, 2005, the circuit court rejected the parties' stipulation and found that the parties had failed to demonstrate that Jackson was mentally retarded under Atkinsv. Virginia. The court entered a final order denying Jackson's mental-retardation claim so that the parties could pursue appellate review of the rejected stipulation agreement.
This is an appeal from the denial of a collateral petition attacking Jackson's death sentence. In reviewing Jackson's conviction on direct appeal, this Court applied a plain-error standard of review. See Rule 45A, Ala.R.App.P. However, we do not apply the plain-error standard when reviewing the denial of a Rule 32 petition in a death case. Hill v. State,695 So.2d 1223, (Ala.Crim.App. 1997). Instead, we apply an abuse-of-discretion standard. Elliott v. State,601 So.2d 1118, 1119 (Ala.Crim.App. 1992).
Jackson filed this petition in the circuit court. According to Rule 32.3, Ala. R.Crim.P., he has the "burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Moreover, the procedural default grounds contained in Rule 32, Ala.R.Crim.P., apply to all cases — even those in which the death penalty has been imposed. See, e.g., Hooks v. State,822 So.2d 476, 479-81 (Ala.Crim.App. 2000).
The State's evidence at Jackson's trial tended to show that on the afternoon of April 15, 1996, Jackson and Alfred Reed robbed the Hillview Grocery Store. Vicki Carroll, who owned the store with her husband Jerry, was talking on the telephone with her husband when Jackson and Reed entered the store. Jackson was armed with a 12-gauge shotgun. During their conversation, Mr. Carroll heard his wife scream, "Take it. Take it all. Take all of it," and concluded that something was amiss. He asked his wife if she was being robbed, to which she replied, "yes." Mr. Carroll then hung up and telephoned 911 to report the robbery.
When law-enforcement officials arrived, they found Mrs. Carroll's body inside the grocery store; she had been shot in the head. A postmortem examination confirmed Mrs. Carroll's cause of death as a close-range shotgun blast to the forehead.
Testimony established that earlier that day John Martin and Alfred Reed went to Chris Dobyne's home in Brent. Martin attempted to persuade him to take part in a robbery; Dobyne refused, and the pair left. While driving away from Dobyne's *Page 153 
house, Martin and Reed came across Jackson, who was walking along the road. They stopped the car and Jackson got inside. The three men drove around and smoked some marijuana. Martin suggested that they rob a store. Reed produced a 12-gauge shotgun, which he handed to Jackson. The trio drove by the Hillview Grocery Store five or six times "to case it" stopping to buy beer at one point — before robbing it. The final time they drove by the store there were no other cars in sight; Martin stopped, let Jackson and Reed out of the car, and arranged to pick them up at a cemetery "down the road" after the robbery. When Martin did not meet Jackson and Reed at the cemetery as planned, they got a ride to Dobyne's house.
According to Angela Smith, who lived with Dobyne, Martin arrived at her house around 4:00 p.m. Martin appeared upset and nervous, stating that a woman had been murdered. Approximately 15 minutes later, Reed and Jackson arrived. The four men — Martin, Reed, Jackson, and Dobyne — began talking. Smith heard Jackson say that he had killed a woman, that he had "blowed her brains out." She heard someone else state that he had thrown the gun used to kill the woman into the river. The four men left the house in Reed's vehicle, split the approximately $200 taken from the grocery store, bought a case of beer, and drove back to Brent. The following day, Jackson again came over to Dobyne's house. He had a newspaper, containing an article about the robbery and murder that had taken place at the Hillview Grocery Store. According to Smith, Jackson stated that he had made the news.
 I.
The dispositive issue in this case is whether the circuit court erred in rejecting Jackson's request that his death sentence be set aside, because, he said, he is mentally retarded.
After we affirmed Jackson's conviction and sentence and after both the Alabama Supreme Court and the United States Supreme Court denied certiorari review in Jackson's case, the United States Supreme Court released its decision in Atkins v.Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335
(2002). In Atkins, the Supreme Court held:
 "We are not persuaded that the execution of mentally retarded criminals will measurable advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our `evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution `places a substantive restriction on the State's power to take the life' of a mentally retarded offender. Ford [v. Wainwright], 477 U.S. [399,] 405 [(1986)]."
536 U.S. at 321, 122 S.Ct. 2242.
In Atkins, the United States Supreme Court discussed two definitions of mental retardation, the one established by the American Association on Mental Retardation and the one used by the American Psychiatric Association. Atkins,536 U.S. at 309 n. 3, 122 S.Ct. 2242. However, that Court declined to establish a "bright-line" test to be applied by the States. Instead, the Court noted: "`we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.' [Ford v.Wainwright, 477 U.S. 399,] 405 [(1986)]."536 U.S. at 317, 122 S.Ct. 2242.
To date, the Alabama Legislature has not established a bright-line test for deciding whether a capital defendant is mentally retarded — as contemplated by Atkins
— and therefore, ineligible for the death penalty. As we noted in Smith v. State, [Ms. *Page 154 
CR-97-1258, September 29, 2006] ___ So.2d ___, ___ (Ala.Crim.App. 2000) (opinion on return to remand after remand by the Alabama Supreme Court), Alabama has only the "Retarded Defendant Act," as codified at § 15-24-1 et seq., Ala. Code 1975, which defines a mentally retarded person as "[a] person with significant sub-average general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments." § 15-24-2(3), Ala. Code 1975. However, the Alabama Supreme Court, in applying Atkins, has held:
 "[A] defendant, to be considered mentally retarded, must have significantly sub-average intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."
Ex parte Perkins, 851 So.2d 453, 456 (Ala. 2002).
On March 9, 2005, the circuit court entered a written order, rejecting the parties' stipulation that Jackson was mentally retarded. (C. 1686-89.) The court's findings regarding Jackson's claim of mental retardation are set out in that March 9, 2005, order:
 "This Court has reviewed all of the reports and supporting documentation provided by the parties. It appears to the Court that Jackson has an IQ in the 70 range. Some tests show a level slightly below 70 and some show a level slightly above 70. This Court, in its sentencing order, found as a fact that, based on the evidence presented at trial, Jackson's `IQ level is between 69 and 72.' The subsequent testing by experts for both the State of Alabama and Jackson show consistent results. His adaptive behavior skills testing show varying results. Some show him significantly higher with a suggestion of no adaptive skills deficits. Others show him significantly lower which indicate significant deficits consistent with mental retardation.
 "Based on the foregoing and the evidence presented at trial, the Court finds that [Jackson's] adaptive behavior is higher than his IQ tests show. The Court is reluctant to accept the stipulation after having heard the evidence at trial and the subsequent sentencing hearing."
(Footnotes omitted.) (Vol. IX, C. 1688.)
As previously noted, this Court applies an abuse-of-discretion standard in reviewing appeals from the denial of a Rule 32 petition. Elliott v. State, 601 So.2d at 1119. Moreover, "[i]f the circuit court is correct for any reason, even though it may not be the stated reason, we will not reverse its denial of the petition." Reed v. State,748 So.2d 231, 233 (Ala.Crim.App. 1999) (citing Roberts v.State, 516 So.2d 936 (Ala.Crim.App. 1987)). We will reverse a circuit court's findings only if they are "clearly erroneous."Barbour v. State, 903 So.2d 858, 861 (Ala.Crim.App. 2004).
 "`"[A] finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746
(1948). . . . If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the *Page 155 
trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).' [Anderson v. City of Bessemer City, N.C.], 470 U.S. [564] at 573-74, 105 S.Ct. [1504] at 151.1 [(1985)]."
Morrison, v. State, 551 So.2d 435, 436-37
(Ala.Crim.App. 1989); see also Barbour v. State,903 So.2d at 862.
Jackson's appeal comes before this Court in a relatively unusual procedural posture. Both sides agree that Jackson is mentally retarded and that, therefore, based on the holding inAtkins v. Virginia, a sentence of death cannot be imposed in his case. As the State noted in its brief to this Court:
 "Although the State may disagree with the decision in Atkins, it is bound by its holding. During these Rule 32 proceedings, the State retained two mental health experts, Dr. Harry McClaren and Dr. Gregory Prichard. Both Dr. McClaren and Dr. Prichard concluded that Jackson is, in fact, mentally retarded. (Vol. VII at 1317-1321, 1326-1336) Therefore, the State concedes that Jackson is mentally retarded, and under Atkins v. Virginia cannot be executed for the capital murder of [Vicki] Carroll. As such, this Court should remand this case back to the Rule 32 trial court and order the court to vacate Jackson's sentence of death and impose a sentence of life in prison without the possibility of parole."
(State's brief at 8-9.)
This Court must now determine whether the circuit court abused its discretion when it rejected the parties' stipulation that Jackson was mentally retarded. The record before us in this case consists of 17 volumes, including the complete appellate record of Jackson's 1997 capital-murder trial, as well as all of the pleadings and other evidence submitted in support of his Rule 32 petition. We have reviewed the entire appellate record, paying particular attention to the evidence and reports submitted by the State and Jackson regarding his claim of mental retardation. (C. 1312-1675.) Based on the evidence before us, it is readily apparent that Jackson falls within the definition of mentally retarded as set out in Exparte Perkins: (1) he has significantly subaverage intellectual functioning (indicated by an IQ of 70 or below); (2) he has significant or substantial deficits in adaptive behavior; and (3) his problems manifested themselves before he reached the age of 18.
Although the circuit court's order suggests that evidence of Jackson's mental retardation is conflicting, that finding is not supported by the record. The evidence submitted by the State from its experts, Dr. Harry McClaren and Dr. Gregory Prichard, indicate that Jackson meets all three standards set out in Ex parte Perkins. Jackson's 2003 evaluation indicated a full-scale IQ of 65. (Vol. VII, C. 1319.) This finding was consistent with evaluations conducted in 1988, when Jackson was in the 4th grade, and 1991, when Jackson was in the 7th grade. On both occasions, Jackson's full-scale IQ was 69. (Vol. VII, C. 1319.) The test results all support a diagnosis of mild mental retardation. The only evidence supporting a full-scale IQ above 70 was the evaluation performed by Dr. John Goff in 1997. (Vol. VIII, C. 1451.) We note, however, that despite Jackson's test score, Dr. Goff nevertheless categorized Jackson as mildly mentally retarded, in light of his adaptive-behavior *Page 156 
deficits. (Vol. VIII, C. 1448-53.) Moreover, the findings in Dr. Goff's report appear to suggest that although Jackson was diagnosed as mildly mentally retarded, the evaluation focused on Jackson's competency to stand trial, noting "[w]e would tend to concur . . . that the patient did have the capacity to distinguish right from wrong at the time of the alleged offense." (Vol. VIII, C. 1452.) Evidence submitted by Jackson's expert witnesses — Dr. Daniel Marson and Joanne Terrell, M.S.W. — were consistent with the findings of Drs. McClaren and Prichard, concluding that Jackson's full-scale IQ scores supported a diagnosis of mildly mentally retarded. (Vol. IX, C. 1668-78; 1679-85.)
The State's experts also conducted adaptive-behavior testing. Jackson's own adaptive-behavior test results indicated "borderline" abilities in adaptive skills. (Vol. VII, C. 1320.) However, interviews of individuals who came in contact with Jackson indicated significant adaptive-behavior deficits consistent with mental retardation. Three of Jackson's teachers were located and interviewed. Billy Wallace, a 10th grade math and English teacher recalled Jackson very well. Wallace stated that Jackson was "definitely" mentally retarded, rating his learning ability at a third- or fourth-grade level. (Vol. VIII, C. 1445.) Steve Bowman, an 11th grade math and history teacher, also clearly re-called Jackson. Bowman rated Jackson very low with regard to adaptive behavior functioning and stated that "without a doubt" Jackson was mentally retarded. (Vol. VIII, C. 1446.) The only teacher who did not classify Jackson as mentally retarded or having adaptive behavior deficits was Roger Brothers, a vocational teacher. Brothers, who taught Jackson for one semester in a forestry class, did not recall anything unusual about Jackson. However, he noted that the class was outdoor oriented and the students spent a lot of time walking around in the woods looking at trees and shrubbery. (Vol. VIII, G. 1442.)
Eugene Rowland, who supervised Jackson while he was employed at Seaman Timber Company, was also interviewed. Rowland stated that he did not have a lot of direct contact with Jackson, but described Jackson's job responsibilities as "very simple" and/or "menial." Rowland indicated that Jackson "often did not show up for work," had problems getting along with his coworkers, and was employed at Seaman Timber for only three months. (Vol. VIII, C. 1444-45.) Jackson's brother Saul was interviewed, providing a historical basis for Jackson's adaptive behavior deficits. (Vol. VII, C. 1320.) Saul, Jackson's older brother, spent a lot of time playing and working with his brother. (Vol. VII, C. 1320.) Jackson appears to have needed fairly close supervision so that he would not "wander off" and "get in trouble." (Vol. VIII, C. 1450.) David Craft, a corrections officer at Holman Prison, was also interviewed regarding Jackson's adaptive behavior. Craft, who became acquainted with Jackson when Jackson was placed on death row, recognized a number of deficits in Jackson's adaptive behavior, despite the "limited demands in adaptive behavior placed on individuals within Death Row." (Vol. VII, C. 1320.) Dr. Goff's 1997 report also concluded that Jackson had significant adaptive-behavior deficits. Dr. Goff's report noted that family members reported that Jackson required "fairly constant supervision," or Jackson would "get in trouble." (Vol. VIII, C. 1450.) Dr. Goff's report also indicated Jackson's inability to maintain employment, noting that Jackson's "vocational history is very sparse," having worked for "a couple of lumber mills in the Bibb County area," but that he had "never been employed for more than three months at a *Page 157 
time." (Vol VIII, C. 1449.) The reports of Dr. Marson and Ms. Terrell likewise support, in some detail, Jackson's history of significant adaptive-behavior deficits. (Vol. IX, C. 1668-78; 1679-85.) Finally, all of the evidence indicated that Jackson's problems manifested themselves well before the age of 18.
Although the court's findings suggest that there is conflicting evidence with regard to Jackson's mental retardation, the circuit court's account of the evidence is not plausible. The evidence overwhelmingly supports a finding that Jackson is mentally retarded and that he is therefore not eligible for the death penalty. In reaching this conclusion, we find the evidence submitted by the State, together with the report of Dr. McClaren and Dr. Prichard to be particularly compelling. It is not unusual for defense evidence to support setting aside a death sentence. However, when the State's evidence likewise supports such a finding, this Court is inclined to give deference to that evidence. Indeed, the only evidence that does not unquestionably support a finding of mental retardation are (1) Jackson's 1997 IQ test results indicating a full-scale IQ of 72 and (2) the interview of a vocational teacher whose recall of Jackson was limited. Further evidence of Jackson's mental retardation is found in the circuit court's own 1997 sentencing order, noting that Jackson's "IQ level is between 69 and 72, [and] that he would be classified as suffering from mild mental retardation." (Vol. XV, C. 1086.) Although this finding would not have prevented the circuit court from sentencing Jackson to death in 1997, such a finding weighs heavily against the court's subsequent conclusion that Jackson was not mentally retarded and rejecting the stipulation entered into by the parties. See, e.g., Smith v. State, ___ So.2d at ___ (setting aside a death sentence imposed by the trial court when its sentencing order found that the appellant was "borderline mentally retarded" and/or "mildly mentally retarded"). Based on these circumstances, we are left with the "definite and firm conviction that a mistake has been committed,"Morrison, 551 So.2d at 436-37, and that the circuit court's findings were clearly erroneous with regard to the question of Jackson's mental retardation.
Because Jackson is mentally retarded, he is ineligible for the death penalty. Atkins v. Virginia,536 U.S. at 321, 122 S.Ct. 2242. Accordingly, this case must be remanded for the circuit court to set aside Jackson's sentence of death and resentence him to life imprisonment without the possibility of parole.
 II.
Jackson raised a number of other claims for relief in his Rule 32 petition and the two amendments to that petition. Jackson states, however, that "[i]n the event that this Court finds Mr. Jackson mentally retarded and orders the lower court to vacate Mr. Jackson's death sentence and impose a sentence of life without possibility of parole, by agreement between the State and Mr. Jackson, the remainder of Mr. Jackson's Rule 32 petition will be abandoned and the rest of this appeal is entirely moot." (Jackson's brief at 58-59.) Because of our disposition of Jackson's mental-retardation claim, we need not address the remaining arguments raised in Jackson's brief to this Court.
 Conclusion
For the reasons set forth in Part I of this opinion, Jackson is not eligible for the sentence of death. Accordingly, we remand this case to the circuit court with instructions that it set aside Jackson's sentence of death and resentence him to imprisonment *Page 158 
for life without the possibility of parole. On remand the court shall take all necessary action to see that the circuit court makes due return to this Court at the earliest possible time and within 42 days of the release of this opinion.
REMANDED WITH DIRECTIONS.*
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
[1] Atkins v. Virginia was released on June 24, 2002.
* Note from the reporter of decisions: On February 16, 2007, on return to remand, the Court of Criminal Appeals dismissed the appeal, without opinion.