STUART, Justice.
The issue in this ease is whether Jerry Jerome Smith is mentally retarded and thus ineligible for the death penalty. See Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding unconstitutional the execution of a mentally retarded offender).
On February 24, 1998, Smith was found guilty of capital murder, and on March 19, 1998, he was sentenced to death. On August 31, 2001, after twice remanding the case for the trial court to address errors in its sentencing order, the Court of Criminal Appeals affirmed Smith’s conviction and death sentence. Smith v. State, 213 So.3d 108 (Ala.Crim.App.2000).
*242 In 2002, after the Court of Criminal Appeals had affirmed Smith’s conviction and sentence and after we had granted Smith’s petition for certiorari review of the Court of Criminal Appeals’ decision, the United States Supreme Court released Atkins. At that time Smith raised an Atkins claim before this Court, which we denied after conducting a plain-error review. We held that the facts before us did not support a finding that Smith was mentally-retarded. However, we reversed Smith’s death sentence and remanded the case to the trial court for new penalty-phase proceedings because the trial court had erroneously excluded certain mitigating evidence during the original penalty phase of Smith’s trial. Ex parte Smith, 213 So.3d 214 (Ala.2003).
On remand, Smith attempted to litigate the Atkins claim in the trial court. It is unclear from our review of the proceedings and the trial court’s order whether the trial court believed that the Atkins claim could be litigated on remand. Before the penalty-phase proceedings could be held on remand, Smith filed three Atkins motions; two of those motions requested a pre-penalty-phase hearing on the issue. During a recess in voir dire examination of the venire for the penalty-phase hearing, the trial court deferred ruling on the Atkins motions until it heard the evidence relating to Smith’s mental capabilities. The trial court specifically denied Smith’s request for a pre-penalty-phase hearing on the Atkins issue. There is no further mention in the record of these motions, and the trial court did not issue a specific ruling on Smith’s Atkins motions.
On November 9, 2004, after the new penalty-phase hearing, the jury recommended that Smith be sentenced to death. In its sentencing order of January 18, 2005, the trial court found as a “nonstatu-tory mitigating circumstance” that Smith is “mildly mentally retarded” but nonetheless imposed a death sentence. On March 22, 2005, the trial court denied Smith’s motion for a new sentencing hearing.
The Court of Criminal Appeals reversed the trial court’s judgment and held as a matter of law that
“[Smith] is mentally retarded and is therefore not eligible for the death penalty. In reaching this conclusion, we find Dr. [Michael] D’Errico’s [1] testimony and change of opinion during the new sentencing proceeding to be compelling. We also find the trial court’s findings that the appellant was borderline mentally retarded and mildly mentally retarded and its findings about his deficits in adaptive behavior to be significant and entitled to great weight.”
Smith v. State, 213 So.3d 226, 236 (Ala.Crim.App.2000)(opinion on return to remand).
The State filed an application for rehearing, which the Court of Criminal Appeals overruled on December 1, 2006. The State then filed a petition for the writ of certio-rari with this Court.
We reverse the judgment of the Court of Criminal Appeals and remand the case for that court to remand it to the trial court with directions that the trial court conduct an Atkins hearing and make an explicit determination whether Smith is mentally retarded and, consequently, ineligible for the death penalty. If the trial court determines that Smith is mentally retarded as provided in Atkins, the trial *243 court has the authority to vacate its sentencing order and resentence Smith to life imprisonment without the possibility of parole.

Facts

On October 19, 1996, at about 8:30 p.m., Smith went to Willie Flournoy’s residence in Houston County to collect between $1,500 and $1,700 Flournoy owed him for crack cocaine. When Smith arrived, Flournoy told Smith that he did not have the money but that he would have it later that night. They then smoked some crack cocaine together before Smith left.
Smith returned to Flournoy’s residence later that night, accompanied by his girlfriend, Lekina Smith. Smith carried with him, inside his sleeve, a sawed-off .22 caliber rifle. Smith again asked Flournoy for his money, but Flournoy said that he did not have it. At that point, Smith told Lekina to get out of the way as he raised his rifle. Smith then shot Flournoy, who was unarmed, with the rifle. In order to eliminate any witnesses, Smith proceeded to shoot Theresa Helms and David Bennett, who were at Flournoy’s house that night and who were also unarmed. Derrick Gross, who was also at the residence, confronted Smith. As Smith tried to prevent Gross from getting away, the two men wrestled over the gun. As the two men struggled at the back steps of the residence, Smith told Lekina to give him a knife she was holding so that he could stab Gross. A vehicle then pulled up to the residence, and Gross was able to get away and report the shootings to the police.
Smith and Lekina fled to Lekina’s father’s house. From there, they got a ride to the residence of Miranda Felder. At Smith’s request, Felder hid the rifle at her residence. Smith and Lekina then went to the residence of Lavoris Smith, Lekina’s mother, where they changed clothes. Smith was eventually apprehended at about 2:00 a.m. at his father’s house, where he was found hiding under the bedcovers. After he was taken into custody and advised of his rights by law-enforcement officers, Smith confessed to the three murders.
In his brief to this Court, Smith sets forth the following evidence from the previous proceedings in support of his claim that he is mentally retarded and, thus, ineligible for the death penalty.
When he was eight years old, Smith’s IQ was measured at 61. Tests given to him at ages 9 and 12 showed his IQ to be 72 and 66, respectively. After repeating the first grade, Smith was classified as “educably mentally retarded” and was placed in special-education classes, where he remained until he left school after the eighth grade. David Glanton, a special-education teacher who knew Smith when he was in elementary school, testified that he believed Smith to be mentally retarded.
Other witnesses testified that it was clear from a young age that Smith had significant mental limitations. Charles Davis, a neighbor, noticed that when Smith was nine years old he was different in “his ability to comprehend and his ability to respond to things you would tell him to do. He couldn’t respond as a normal child would.” Fred Davis, a childhood friend and neighbor of Smith’s, testified that he regarded Smith as mentally retarded based on his knowledge of Smith’s childhood. Davis testified that if Smith was asked to drive to a specific address to pick up some documents, he would be unable to do so. A third neighbor, Napoleon Bradley, who also knew Smith as a child, regarded him as “slow.” Bradley was an automobile mechanic, and when Smith was a teenager he would help Bradley with his work, but Bradley had to carefully supervise Smith and could entrust him with only simple tasks.
*244 Testimony indicated that Smith struggled with literacy into adulthood. Officer Ted Yost, formerly of the Headland Police Department, testified that he stopped Smith in Headland in October 1996 for a traffic violation. Smith gave his name as “Christopher Michael Turner,” but after he was arrested signed a waiver-of-rights form “C-U-M-R-I-M T-U-M-N-T-HN.”
In July 1997, in preparation for Smith’s trial, Dr. Michael D’Errico, a forensic psychologist, tested Smith’s IQ and found it to be 67. Two months later, a defense expert tested Smith’s IQ and reported the resulting score to be 72.
During the guilt phase of trial, Smith called Dr. Donald Crook, a licensed professional counselor, who testified that before developing his opinion of Smith’s intelligence level, he administered the Wechsler Adult Intelligence Scale IQ test to Smith. Dr. Cook stated that Smith scored a full-scale IQ of 72 on this test. Based on this IQ score and a childhood IQ score of Smith’s, Dr. Crook opined that Smith’s level of functioning was best described as mildly mentally retarded.
Additionally, during the guilt phase of Smith’s trial, the State called Dr. D’Errico, who testified that in his opinion Smith was “mildly mentally deficient.” Dr. D’Emco also testified at the second penalty-phase hearing; at that time he diagnosed Smith as being mildly mentally retarded. Dr. D’Errico explained that he did not see the record containing Smith’s IQ score of 61 at age eight until the summer of 2004, which was after Dr. D’Errico had testified in the first trial. Dr. D’Emco testified that this early test score provided additional information necessary to support his present diagnosis that Smith is mildly mentally retarded.
Evidence regarding the history of mental retardation in Smith’s family was also presented at the second penalty-phase hearing. At least three of Smith’s siblings have been diagnosed with mental retardation. Smith’s brother, Arlester, is described in records from the Department of Human Resources as “severely retarded.” Another brother, Darron, has a full-scale IQ of 65 and was diagnosed as being mildly mentally retarded. Smith’s sister, Debra, was also diagnosed as being mildly mentally retarded. In addition, his sister Mary attended special-education classes. Charles Davis testified that Smith’s mother was also mentally retarded.
On the other hand, in addition to the facts surrounding the murders that show Smith’s intellectual and adaptive functioning at the time of the offenses, the State sets forth the following evidence that tends to show that Smith is not mentally retarded.
Smith testified on his own behalf during the guilt phase and the first penalty phase of his trial. Smith was articulate and responded appropriately to the questions asked of him during his testimony. In addition, he did not have any difficulty understanding the questions. During his testimony, Smith used words such as “paranoid” and “overexaggerate” appropriately. He also knew that there were 60 minutes in an hour and that 911 was the telephone number to call in an emergency. Smith testified that at the time of his trial he was 27 years old and had an eighth-grade education but that he could not read or write. He also testified that on October 19, 1996, he was living at 608 Whiddon Street. Smith also knew what he was saying when he testified, knew where he was, and understood the charges against him. Also, as this Court has previously found, “the record indicates that before the murders Smith was able to hold various jobs. At the time of the murders, *245 Smith was working a construction job.” Ex parte Smith, 213 So.3d at 225.
During the guilt phase of the trial, Smith testified that he was not married to Lekina Smith but that he considered her to be his common-law wife and that they had been in that relationship for a year— that he lived with her, slept with her, and they had talked about having children together.
Smith also testified that he had been involved in an interstate drug ring with a man named Tony. Smith first met Tony, a Jamaican who lived in Ft. Lauderdale, Florida, while Smith was serving time in prison on charges of assault, unlawful breaking and entering of a motor vehicle, robbery, and escape. On at least one occasion, in August 1996, Smith met Tony in Jacksonville, Florida, and obtained drugs from him. Smith testified that he knew that bringing drugs from Florida to Alabama was illegal but that he did it anyway because he wanted to make money. At the time of the murders, Smith owed Tony $27,000, and Tony had threatened to kill Smith and his mother if Smith did not pay him. Smith also testified that at the time of the murders he had a $400-a-day crack habit and that he sold drugs to maintain that habit.
As noted earlier, Smith called Dr. Crook to testify during the guilt phase of the trial. Dr. Crook testified that in his opinion Smith’s level of mental functioning was best described as mildly mentally retarded. However, as this Court observed in our prior opinion:
“Dr. Crook admitted that his conclusions did not take into consideration Smith’s articulate statement made to the police after he was arrested for the murders; the facts surrounding the murders, which indicate intentional, goal-oriented behavior; Smith’s relationship with his girlfriend; or Smith’s statements while he was in jail awaiting trial to the effect that he had committed the murders and that he would ‘get off on a plea of mental disease or defect.”
Ex parte Smith, 213 So.3d at 225.
Furthermore, as noted earlier, the State called Dr. D’Errico to testify during the guilt phase. Dr. D’Errico testified that when he talked to Smith he could see that Smith was very “street-wise” or “street-smart.” Dr. D’Errico defined mild mental retardation as follows:
“Mild[ly] mentally retarded means that you have an individual who scored between 50 and 70 on a standardized intelligence test. Also, an individual has at least two deficits in two areas of independent functioning, and these intellectual deficits and independent functioning deficits were apparent before the individual was the age of eighteen.”
Although Smith scored below a 70 on the intelligence test Dr. D’Errico administered to him, Dr. D’Errico did not classify Smith as mildly mentally retarded; rather he classified him as mildly mentally deficient. Dr. D’Errico explained this decision as follows:
“Mild[ly] mentally deficient refers to intellectual ability as measured by an intelligence test. Mild[ly] mentally retarded is an official diagnosis which involves not only intellectual deficits, but as I stated before, deficits in independent living. When I reviewed Mr. Smith’s case, I found that he was living independently at a level, probably, higher than a mentally retarded individual would be living. Therefore, I felt that I was at a loss to come up with a diagnosis of mental retardation. However, his score on the intelligence test placed him in the mild range of mental deficiency.”
*246 Smith called Dr. D’Errico to testify at the second penalty-phase hearing; he testified that he had changed his opinion about Smith’s intellectual functioning from his trial testimony, and he now concluded that Smith is mentally retarded. Dr. D’Errico testified that he classified Smith as mentally deficient during the initial trial because he lacked clear evidence of Smith’s low IQ before age 18.
During Smith’s second penalty-phase hearing, Kevin Bridges, who had been incarcerated with Smith for a year, testified that he had heard Smith telling other inmates that he was going to “get off’ the capital-murder charges on a “mental plea.”
Officer Yost also testified for the State during Smith’s second penalty-phase hearing. On October 16, 1996, Officer Yost was a patrolman with the Headland Police Department. On that night, while driving a marked police car, Officer Yost observed a vehicle that had a cracked windshield and one working headlight. It appeared to Officer Yost that the vehicle was trying to avoid him. When the vehicle stopped, Officer Yost pulled up to it. Officer Yost identified Smith as the man he saw get out of the vehicle and walk to a pay telephone. Officer Yost approached Smith and identified himself as a police officer. Smith told Officer Yost that his name was Christopher Michael Turner. After Smith admitted that he had a pistol under the driver’s seat of the vehicle, Officer Yost obtained Smith’s consent to search the vehicle, and he confiscated the pistol. Smith stated that he did not have a permit for the gun, so Officer Yost arrested Smith for carrying a concealed weapon. Officer Yost then transported Smith to the Headland Police Department. After arriving at the police station, Smith told the officers that he needed to go to the bathroom. While in the bathroom, Smith escaped. Officer Yost learned that Smith had given him a false name when Smith was arrested three days later on the capital-murder charge.
Additionally, the State called Dr. Doug McKeown, a forensic psychologist, to testify at the second penalty-phase hearing. Dr. McKeown testified that a person is not automatically classified as mentally retarded if the person’s IQ score is below 70. Dr. McKeown explained that a number of different variables affect an individual’s performance on an IQ test, including the individual’s relationship with the examiner, the individual’s interest in taking the test, and the individual’s motivation while taking the test. Dr. McKeown also testified that when considering whether an individual could be classified as mentally retarded, a psychologist also has to consider an individual’s adaptive functioning. Dr. McKeown testified that a person’s adaptive-functioning skills are just as important, or more important, than an IQ score because they indicate a person’s ability to function in the real world. According to Dr. McKeown, an IQ score cannot show how well a person functions in his environment and in society.
Dr. McKeown explained that he examined a wealth of information concerning Smith before he rendered his opinion that Smith is not mentally retarded. This information included Dr. Crook’s report, Dr. D’Errico’s report, Smith’s test results on the Vineland Social Maturity Scale, and historical documents indicating Smith’s intelligence. Dr. McKeown also reasoned that a mentally retarded person could not (as Smith had done): file a Rule 32, Ala. R.Crim. P., petition,[2] give a false name to police, escape from custody, understand *247 the word “paranoid,” want to represent himself in court, put items on layaway, do mechanical work on cars, pay child support, live independently, or respond appropriately to questions in a deposition. Therefore, Dr. McKeown stated that Smith is not mentally retarded but functions more in the borderline range of intellectual functioning.

Discussion

The State contends that the Court of Criminal Appeals erred in finding that Smith is mentally retarded as a matter of law and, consequently, in reversing Smith’s sentence of death. Specifically, the State alleges that the decision of the Court of Criminal Appeals conflicts with this Court’s decision in Ex parte Smith because the holding of the Court of Criminal Appeals focused on Smith’s intellectual and adaptive functioning before age 18, while ignoring Smith’s intellectual and adaptive functioning at the time of the offense. The State also alleges that the Court of Criminal Appeals erred by placing “great weight” on the trial court’s finding that Smith is “mildly mentally retarded” because that finding was only in the context of a “nonstatutory mitigating circumstance.” The State further argues that the Court of Criminal Appeals erred by holding that Smith is mentally retarded for Atkins purposes because the appellate court’s determination rested on the appellate record and that court cannot determine the weight and credibility to give the changed testimony of Dr. D’Errico without an initial finding of fact by the trial court, which had an opportunity to observe Dr. D’Errico and assess his credibility.
I. Definition of Mental Retardation under Atkins
In order to accomplish our review of this case, this Court must first consider the definition of mental retardation in the context of an Atkins claim. In Atkins, the United States Supreme Court set forth some clinical definitions of mental retardation as examples, but clearly left the ultimate determination of what constitutes mental retardation to the individual states, as follows:
“To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in Ford v. Wainwright, 477 U.S. 399 (1986), with regard to insanity, ‘we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.’ Id., at 405, 416-17.”
536 U.S. at 317 (footnote omitted).
In deciding that the execution of a mentally retarded offender is unconstitutional, the United States Supreme Court hinged its reasoning on a definition of mental retardation that requires “not only subav-erage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.” Atkins, 536 U.S. at 318.
This Court has not previously taken up the task of specifically defining what constitutes mental retardation in the Atkins context because doing so is a policy decision that is more appropriately the responsibility of the legislature. In previous *248 cases, this Court has merely reviewed a lower court’s decision on an Atkins claim under the plain-error standard of review and applied the “most common” or “broadest” definition of mental retardation, as represented by the clinical definitions considered in Atkins and the definitions set forth in the statutes of other states that prohibit the imposition of the death sentence when the defendant is mentally retarded. See, e.g., Ex parte Perkins, 851 So.2d 453, 455-56 (Ala.2002). We have taken this action while urging “the Legislature to expeditiously develop procedures for determining whether a capital defendant is mentally retarded and thus ineligible for execution.” Ex parte Perkins, 851 So.2d at 455 n. 1.
Until the legislature defines mental retardation for purposes of applying Atkins, this Court is obligated to continue to operate under the criteria set forth in Ex parte Perkins. We reiterate that policy decisions such as this should be made by the legislature, not this Court, and we continue to urge the legislature to define mental retardation for use in the context of an Atkins claim and to establish a procedure for deciding such a claim. However, until the legislature acts, the definition of mental retardation set forth in Ex parte Perkins, along with the procedures set forth in this opinion, must guide the lower courts in deciding Atkins claims.
In Ex parte Perkins, we concluded that the “broadest” definition of mental retardation consists of the following three factors: (1) significantly subaverage intellectual functioning (i.e., an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of these problems during the defendant’s developmental period (i.e., before the defendant reached age 18). 851 So.2d at 456. All three factors must be met in order for a person to be classified as mentally retarded for purposes of an Atkins claim. Implicit in the definition is that the subaverage intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18. This conclusion finds support in examining the facts we found relevant in Ex parte Perkins and Ex parte Smith and finds further support in the Atkins decision itself, in which the United States Supreme Court noted: “The American Association on Mental Retardation (AAMR) defines mental retardation as follows: ‘Mental retardation refers to substantial limitations in present functioning.’ ” 536 U.S. at 308 n. 3 (second emphasis added). Therefore, in order for an offender to be considered mentally retarded in the Atkins context, the offender must currently exhibit subaverage intellectual functioning, currently exhibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18.
The definition set forth in Ex parte Perkins is in accordance with the definitions set forth in the statutes of other states and with recognized clinical definitions, including those found in the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed.1994). The Manual of Mental Disorders lists four degrees of mental retardation: mild, moderate, severe, and profound. Id. at 40-41. All four degrees of mental retardation require that all three prongs of the Ex parte Perkins test be satisfied before an individual can be diagnosed as mentally retarded; thus, if the defendant proves that he or she suffers any degree of mental retardation, the defendant is ineligible for the death penalty.[3] *249 However, a classification of “borderline intellectual functioning” describes an intelligence level that is higher than mental retardation, id. at 45, 684, and, thus, does not render a person ineligible for the death penalty.
Finally, we note that one section of the trial court’s sentencing order lists certain evidence that was presented at trial and that the court considered in deciding whether a certain statutory mitigating circumstance existed. In that section, the trial court states that evidence was presented indicating that Smith is “borderline mentally retarded.” The term “borderline mentally retarded” does not have a clinical definition, nor is it generally recognized by the psychiatric community. See Manual of Mental Disorders (no definition provided for “borderline mentally retarded”). Therefore, because this term has no basis on which to support a diagnosis of intelligence, it should not be used in legal proceedings when determining an offender’s intellectual functioning.
II. The Court of Criminal Appeals’ Decision Conflicts with this Court’s Decision in Ex Parte Smith
In Ex parte Smith, Smith raised an Atkins claim before this Court. In reviewing that claim, we applied the plain-error standard of review and the three-prong test for mental retardation found in Ex paite Perkins, requiring a defendant to show significant subaverage intellectual functioning at the time the crime was committed, to show significant deficits in adaptive behavior at the time the crime was committed, and to show that these problems manifested themselves before the defendant reached the age of 18. We reviewed the facts presented at Smith’s trial, including the testimony of Dr. Crook and the testimony of Dr. D’Errico, and held as follows:
“We reject Smith’s contention that in light of the holding in Atkins, we must remand this cause for the trial court to conduct a hearing to determine if he is mentally retarded and therefore not subject to the death penalty. Plain error did not occur in that regard in this case.

((

“Based on the facts presented at Smith’s trial, under even the broadest definition of mental retardation Smith is not mentally retarded. Those states that have statutes prohibiting the execution of a mentally retarded defendant require that to be considered mentally retarded a defendant must have significantly subaverage intellectual functioning (an IQ score of 70 or below) and significant or substantial deficits in adaptive behavior. Additionally, those problems must have manifested themselves before the defendant reached age 18.
[[Image here]]
“The testimony with regard to Smith’s intellectual functioning indicates that he falls within the borderline to mildly mentally retarded range with an overall IQ score of 72 a year after the murders, which seriously undermines any conclusion that Smith suffers from significantly subaverage intellectual functioning as contemplated under even the broadest definitions.
“Likewise, with regard to evidence of ‘significant’ or ‘substantial’ deficits in adaptive behavior, our review of the rec *250 ord indicates little, if any, deficit. At the time of the murders, Smith had had an ongoing year-long relationship with his girlfriend. His articulate testimony indicates that he loved his girlfriend, maintaining that she had been his ‘common-law wife’ for a year, and that they had planned on having children. Additionally, we note that the evidence indicates that before Smith shot the first victim, he told his girlfriend to move out of harm’s way.
“Moreover, the record indicates that before the murders Smith was able to hold various jobs. At the time of the murders, Smith was working a construction job. More insightful into Smith’s adaptive behavior is the fact that Smith was involved in an interstate illegal-drug enterprise. Smith testified that at the time of the murders he was under stress because he owed a Jamaican drug supplier in Jacksonville, Florida, $27,000. Smith admitted that at the time of the murders he was addicted to cocaine and that he was using $400 worth of crack cocaine per day; he said that in order to maintain that habit he ‘distributed’ drugs.
“Furthermore, the fact that Smith gave a police officer a false name two days before the murders when he was stopped for a traffic violation, the circumstances surrounding the murders, Smith’s actions after the murder—enlisting the help of a friend to dispose of the gun and to hide from the police—his bragging about the murders, his statement about ‘getting off using a mental-disease-or-defect defense, and his statement that he shot two of the individuals in the house to eliminate witnesses indicate that Smith does not suffer from deficits in his adaptive behavior.
“Lastly, because the evidence does not support Smith’s contention that he manifested subaverage intellectual functioning and significant deficits in adaptive behavior, we need not address the third factor—whether those problems evinced themselves before Smith was 18 years old.
“Because the record does not support Smith’s contention that he falls within the parameters of the most liberal requirements to support a finding of mental retardation, we reject his contention that we must remand this cause for re-sentencing on this ground. Applying the plain-error standard of review, we hold that no reversible error occurred in this regard and a death sentence may be imposed in this case if such a sentence is deemed proper after the new penalty-phase proceeding.”
Ex parte Smith, 213 So.3d at 224-26.
Initially, we hold that the Court of Criminal Appeals correctly held that our holding in Ex parte Smith did not preclude the trial court from allowing the Atkins claim to be litigated on remand if relevant new evidence was presented. Indeed, because our holding with regard to Smith’s Atkins claim consisted of a plain-error review based solely on the record that was before us, if new facts were presented on remand that would change the result of our analysis in Ex parte Smith, then litigation of the Atkins claim was proper.
The State argues that the decision of the Court of Criminal Appeals conflicts with our decision in Ex parte Smith because, the State argues, in holding that Smith is mentally retarded the Court of Criminal Appeals ignores the first two prongs of the Perkins test and rests its conclusion entirely on new evidence that was presented of Smith’s intellectual functioning and adaptive behavior before age 18. We agree.
The Court of Criminal Appeals stated:
*251 “The record before us, which was more fully developed on remand following Atkins, affirmatively establishes that, well before age eighteen, [Smith] had significantly subaverage intellectual functioning. Specifically, as early as age eight, his IQ score was 61. There is also an indication that [Smith’s] IQ at age twelve was 66. From an early age, [Smith] performed poorly in school. As a result, he was classified as educably mentally retarded and was placed in special education classes. Finally, subsequent Stanford Achievement Test scores showed that he was below average in the majority of the areas tested.
“When it conducted its plain error review of this issue based on the record before it, the Alabama Supreme Court did not have the benefit of information about [Smith’s] IQ scores and adaptive skills before the age of eighteen. In fact, it specifically noted that, based on the record before it at that time, it did not need to address the matter of whether [Smith’s] problems manifested themselves before the age of eighteen. Likewise, [Dr.] D’Errico did not have such information when he first concluded that [Smith] was mildly mentally deficient. However, he explained that the additional information about [Smith’s] IQ scores and adaptive skills before the age of eighteen caused him to change his initial opinion and conclude that [Smith] was indeed mildly mentally retarded.
“In addition, the record affirmatively establishes that [Smith] had significant or substantial deficits in adaptive behavior before the age of eighteen. He clearly had significant or substantial deficits in functional academics. Also, the testimony of various witnesses who knew [Smith] during his developmental period establishes that, at the very least, he had substantial deficits in self-care, home living, and social skills. In fact, even the State’s expert, Dr. McKeown, conceded that [Smith] had deficits in home living and functional academics.
“For these reasons, we conclude that [Smith] is mentally retarded and is therefore not eligible for the death penalty.”
Smith v. State, 213 So.3d at 236.
The Court of Criminal Appeals’ focus on Smith’s functioning before the age of 18 is misplaced. Both Ex parte Smith and Ex parte Perkins specifically hold that all three prongs of the test set forth in Ex parte Perkins must be satisfied in order for a person to be considered mentally retarded. Consequently, the holding of Court of Criminal Appeals conflicts with our decision in Ex parte Smith by placing great emphasis on new evidence that tended to show deficits in Smith’s intellectual functioning and adaptive behavior before he reached the age of 18, while ignoring evidence that shows that Smith’s intellectual functioning and adaptive behavior as an adult places him above the mentally retarded range. Therefore, the judgment of the Court of Criminal Appeals is reversed because that court did not apply the first two prongs of the three-prong test set forth in Ex parte Perkins to reach its conclusion.
III. The Trial Court’s Factual Finding that Smith Is Mildly Mentally Retarded as a Mitigating Circumstance Should Not Be Given “Great Weight” in Support of Smith’s Atkins Claim
The State contends that the Court of Criminal Appeals erred in placing “great weight” on the trial court’s finding that Smith is mildly mentally retarded, which finding was made in the context of a nonstatutory mitigating circumstance. The trial court found, without mentioning *252 Atkins, that the evidence established as a “nonstatutory mitigating circumstance” that “Jerry Jerome Smith is mildly mentally retarded.” The issue is whether such a finding is necessarily the same as finding someone mentally retarded for Atkins purposes and, thus, whether the finding should be given “great weight” in determining whether the defendant is eligible for the death penalty.
In his dissent in Smith v. State, Judge Shaw noted the actions of the trial court regarding Smith’s Atkins motions and then emphasized that the record is not clear as to whether the trial court considered any of Smith’s evidence of mental retardation as relevant to an Atkins claim or whether it believed that evidence of mental retardation would be relevant only as a mitigating circumstance. Smith v. State, 213 So.3d at 237 (Shaw, J., dissenting). The record supports Judge Shaw’s observation.
Smith maintains, and the Court of Criminal Appeals appears to agree, that the trial court’s finding as a mitigating circumstance that he is mildly mentally retarded is necessarily the same as finding that Smith is mentally retarded in the Atkins context. However, the two findings are not the same. A finding of mild mental retardation in the context of a mitigating circumstance does not necessitate a finding that a person fits the definition of mental retardation in the context of an Atkins claim. At least one reason for this conclusion is that the burden of proof in each context is completely different. The burden of proof on the defendant in proving the existence of a mitigating circumstance is much lower than the burden the defendant faces when attempting to prove that he is mentally retarded for purposes of Atkins, The burden of proof to establish a mitigating circumstance is as follows:
“The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.”
§ 13A-5-45(g), Ala.Code 1975.
In the context of an Atkins claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded and thus ineligible for the death penalty. See Morrow v. State, 928 So.2d 315, 323 (Ala.Crim.App.2004); see also Holladay v. Campbell, 463 F.Supp.2d 1324, 1341 n. 21 (N.D.Ala.2006) (interpreting Alabama law to require that the defendant prove mental retardation by a preponderance of the evidence). Therefore, it is certainly possible for a court to conclude that a defendant has met his burden of proving mild mental retardation as a mitigating circumstance but, at the same time, to conclude that the defendant has not carried the burden of proving mental retardation for purposes of an Atkins claim. Consequently, the Corn-t of Criminal Appeals erred in placing “great weight” on the trial court’s finding, made in the context of a nonstatutory mitigating circumstance, that Smith is mentally retarded to conclude that Smith can be categorized as mentally retarded in an Atkins context.
The trial court appears to have correctly concluded that a finding of mild mental retardation in the context of a mitigating circumstance does not necessitate a finding of mental retardation on an Atkins claim. The trial court’s view is evidenced by a complete absence of any mention of Atkins in its sentencing order and the obvious *253 inconsistency that would result in holding that a person meets the definition of mental retardation for the purposes of an Atkins claim and then sentencing that person to death, in violation of Atkins. Thus, the trial court’s finding of this nonstatutory mitigating circumstance merely establishes that Smith interjected the issue of his mild mental retardation and that the State failed to disprove that fact and, thus, that Smith’s mild mental retardation existed as a mitigating circumstance. This finding, however, does not establish that Smith satisfied his burden of proof to warrant relief under Atkins. Therefore, the Court of Criminal Appeals erred by placing “great weight” on the trial court’s finding that Smith is mildly mentally retarded in the context of a mitigating circumstance to conclude that Smith is mentally retarded in an Atkins context.
IV. The Record Does Not Clearly Demonstrate that Smith Is Mentally Retarded
Finally, the State contends that the Court of Criminal Appeals erred by holding that Smith is mentally retarded in an Atkins context because an appellate court’s determination rests solely on the record and that court cannot determine the weight and credibility to give the changed testimony of Dr. D’Errico without an initial finding of fact by the trial court, which had an opportunity to observe Dr. D’Errico and to assess his credibility.
Based on all the evidence that has been presented, it is not clear that Smith is mentally retarded as a matter of law. As Judge Shaw correctly stated: “Such a question involves a factual finding based on weight and credibility determinations, determinations that are better left in the first instance to the trial court, which had the opportunity to personally observe the witnesses and assess their credibility.” Smith v. State, 213 So.3d at 239 (Shaw, J., dissenting). Therefore, neither this Court nor the Court of Criminal Appeals should make any factual determination as to Smith’s mental retardation for purposes of Atkins without allowing the trial court to make the initial determination on the issue.
Contrary to the Court of Criminal Appeals’ holding, Dr. D’Errico’s changed testimony is not a compelling reason to'fihd that Smith is mentally retarded for purposes of Atkins but is a compelling example of why the trial court should be allowed to make the initial determination of Smith’s mental retardation; the trial court is in a much better position than this Court or the Court of Criminal Appeals to observe Dr. D’Errico and to evaluate his credibility.
Here, Smith presented the trial court with three Atkins motions. The trial court, however, did not address the merits of Smith’s Atkins claim. The exact reason for the trial court’s failure to make an explicit determination on Smith’s Atkins motions is unclear from the record.
Generally, an Atkins claim should be raised and addressed by the trial judge in a pretrial hearing without a jury. Morrow, 928 So.2d at 324. However, if it was not possible to raise the claim at trial or on appeal because a defendant was sentenced to death and had exhausted his appeals before the Atkins decision was released, then the defendant should bring any Atkins claim he or she may have in a Rule 32, Ala. R.Crim. P., petition; See, e.g., Jackson v. State, 963 So.2d 150 (Ala.Crim.App.2006). In the rare situation, such as the one presented here—where the defendant had already been convicted and sentenced to death but his case was pending on appeal at the time Atkins was released—the defendant is allowed to have the claim reviewed by the trial court if the *254 case is remanded and new evidence of mental retardation is presented. This procedure gives the defendant an initial opportunity to properly present and litigate his Atkins claim in the trial court, and it serves to promote judicial economy.
In the present case, Smith could not have raised his Atkins claim in the trial court before the case was remanded because Atkins had not yet been decided. Smith could, and did, raise the Atkins claim on remand, but the trial court did not address it. Therefore, in order to assure that Smith has had a chance to properly present his Atkins claim in the trial court and that the reviewing appellate court has factual findings from the trial court related to the Atkins claim, we remand this case for the trial court to conduct a hearing, without a jury, on Smith’s Atkins claim. At the hearing, Smith and the State may introduce any additional evidence that would aid the trial court in determining whether Smith is mentally retarded. Remand for an Atkins hearing will allow the trial court to make the factual determinations, including credibility determinations, in an Atkins context. After the hearing, the trial court shall enter an order that explicitly states its determination on the Atkins issue and that makes specific findings of fact with regard to each of the three Ex parte Perkins criteria. Then the appellate courts can review the trial court’s Atkins determination under a standard of review that is deferential to the trial court, as we do in other contexts concerning factual determinations and as the Court of Criminal Appeals has previously held should be done in the context of an Atkins claim. See Morrow, 928 So.2d at 323 (holding that when there are disputed facts the standard of review is whether the trial court exceeded the scope of its discretion).

Conclusion

The judgment of the Court of Criminal Appeals is reversed, and this case is remanded for that court to remand this case to the trial court with directions that the trial court conduct an Atkins hearing, make a specific determination as to whether Smith is mentally retarded for purposes of Atkins, and enter an order with specific findings of fact concerning each of the three Ex parte Perkins criteria. If the trial court determines that Smith is mentally retarded as provided in Atkins, and thus ineligible for the death penalty, the trial court has the authority to vacate Smith’s sentence and to resentence Smith to life imprisonment without the possibility of parole.
REVERSED AND REMANDED WITH DIRECTIONS.
SEE, SMITH, BOLIN, and PARKER, JJ., concur.
LYONS, WOODALL, and MURDOCK, JJ., concur in the rationale in part and concur in the result.
COBB, C.J., recuses herself.

. Dr. Michael D'Errico, a forensic psychologist, testified at the new penalty-phase hearing that Smith was “mildly mentally retarded.” He had previously testified at Smith’s trial that Smith was "mildly mentally deficient,”

. In 1991, Smith filed a pro se Rule 32, Ala. R.Crim. P., petition challenging his 1991 conviction for first-degree assault.

. If a person is deemed to be mentally retarded because the three prongs of Ex parte Per *249 kins have been satisfied, the degree of mental retardation is based on the level of intellectual impairment: Mild = IQ level 50-55 to approximately 70; Moderate = IQ level 35-40 to 50-55; Severe = IQ level 20-25 to 35-40; Profound = IQ level below 20 or 25. Manual of Mental Disorders at 40.