[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10721

_____

D.C. Docket No. 1:05-cv-00474-CG-M


JOSEPH CLIFTON SMITH,

Petitioner-Appellant,

versus

DONAL CAMPBELL,
COMMISSIONER KIM TOBIAS THOMAS,

Respondents-Appellees.


_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(August 3, 2015)

Before TJOFLAT, HULL and WILSON, Circuit Judges.

HULL, Circuit Judge:

Petitioner Joseph Clifton Smith, a death-row inmate, appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. This appeal involves only Smith's Atkins claim—that he is intellectually disabled and cannot be executed under the Eighth and Fourteenth Amendments to the United States Constitution.[1] See Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002). The Alabama state courts denied Smith's Atkins claim without an evidentiary hearing, as did the district court. We review the history of Smith's case and then the narrow issue in this appeal.

## I. FACTUAL BACKGROUND

### A.    Murder of Durk Van Dam

On Friday, November 21, 1997, Smith was released from a state prison and transferred to a community-custody program to complete the remainder of his 10-year sentence for his burglary and theft convictions. Smith v. State ("Smith I"), 795 So. 2d 788, 796, 797 n.1 (Ala. Crim. App. 2000). Two days after his release from prison, Smith murdered the victim Durk Van Dam on November 23, 1997.

Police discovered Van Dam's body near his pick-up truck in an isolated area in southern Mobile County. Van Dam suffered approximately 35 separate, distinct exterior injuries. His head, face, and torso were beaten; his corpse revealed a

---

[1]Although courts formerly employed the term "mental retardation," we now use the term "intellectual disability" to describe the same condition. Accord Brumfield v. Cain, 576 U.S. ___, ___ n.1, 135 S. Ct. 2269, 2274 n.1 (2015). However, we sometimes use the terms "mental retardation" and "mentally retarded" when quoting or discussing earlier judicial opinions, court orders, trial testimony, or other items that used those terms at the time.

2

number of blunt force injuries; and his body was mutilated by a saw or a saw-like device. Van Dam was robbed of $150 in cash and the boots off his feet. His tools were stolen from his pickup truck, which was mired in mud.

## B.    Smith's Statements to Police

On the day Van Dam's body was discovered, two police officers interviewed Smith, who confessed. In his first statement to the police, Smith admitted that he was at the scene when Van Dam was beaten and robbed but claimed that he was merely a bystander as Larry Reid beat Van Dam. See id. at 796.

When police questioned Reid, Smith repeatedly knocked on the interrogation-room door and requested to speak with the officer who took his first statement. Id. Smith gave a second statement, admitting he participated in the homicide but denying an intent to kill Van Dam. See id.

In his second statement, Smith said that he, Reid, and Van Dam left a motel in Van Dam's red pick-up truck on the evening of November 23, 1997. Id. Van Dam was drinking and driving the truck, and Reid directed Van Dam to an isolated location. Id. Smith asserted that, once they arrived at the location, Reid began hitting Van Dam. Reid kicked Van Dam in the face, at which point Smith thought Van Dam was dead. Id. However, Van Dam got up, and Smith hit him on the head with his fist, kicked him in the ribs several times, threw a handsaw at him,

and might have hit him with a hammer.  Id.  Smith wasn't entirely sure if he hit Van Dam with a hammer because he suffers from blackouts.  Id.

Smith stated that Reid got a power saw from Van Dam's truck and ran the saw against Van Dam's neck.  Id.  Smith said he held down Van Dam while Reid took money from Van Dam's pockets.  Id.  Reid kept $100, and Smith kept $40.  Id.  Toward the end, Smith kicked Van Dam in the ribs several times.  Van Dam was alive at that point, Smith said, but Reid subsequently hit the victim in the head several times with boards and sticks and dragged a mattress on top of him.  Smith and Reid left, and Smith thought Van Dam was alive as they walked away.

Smith and Reid attempted to steal Van Dam's truck, but it was stuck in the mud.  Id.  Smith admitted to taking Van Dam's boots and tools.  Id.  Smith and Reid discussed what to do with Van Dam's body.  Id.  Smith suggested taking it to a nearby lake, but they left the body under a mattress near Van Dam's truck.  Id.

## II. SMITH'S TRIAL AND VERDICT

On May 22, 1998, a Mobile County grand jury indicted Smith for capital murder, charging that Smith intentionally killed Van Dam during a first-degree robbery.  The case went to trial.

At trial, Dr. Julia Goodin, a forensic pathologist, testified that Van Dam died as a result of 35 different blunt-force injuries to his body.  Id.  Dr. Goodin found marks on Van Dam's neck, shoulder, and back that were consistent with Van Dam

4

being cut by a saw.  Id.  Van Dam had a large hemorrhage beneath his scalp, brain swelling, multiple rib fractures, a collapsed lung, abrasions to his head and knees, and defensive wounds on his hands.  Id.  The most immediate cause of death was probably Van Dam's multiple rib fractures, which caused one lung to collapse.  Id.

The prosecution introduced Smith's two statements to police and called Russell Harmon, who saw Smith on the day of the murder at a motel in Mobile County.  See id. at 796–97.  Harmon testified that Smith told him that Smith and Reid were going to rob Van Dam, and Smith asked if Harmon wanted to join them.  See id. at 797.  Harmon declined.  Id.  When Smith returned to the motel later that night, Smith admitted to Harmon that he participated in the beating of Van Dam and cut Van Dam with a saw before fleeing the crime scene—and leaving Van Dam for dead.  Id.  Smith told Harmon that he hid Van Dam's tools on the side of a road, and Smith asked Harmon to retrieve them.  Harmon did.  Smith sold the tools for $200.  Id.

Joey Warner, an employee of a pawnshop, testified that (1) on November 23, 1997, Smith pawned several tools, including saws, drills, and a router; (2) Smith was given $200 for the tools; and (3) Smith showed his Alabama Department of Corrections identification card to complete the transaction.  Id.

Another witness, Melissa Arthurs, testified that she saw Smith on the night Van Dam disappeared and noticed blood on Smith's shirt.  Id.  Smith told Arthurs

5

that he hit, cut, and stabbed Van Dam in the back; he and Reid robbed Van Dam; and Smith would have taken Van Dam's truck had it not been stuck in the mud.[2] See id.

On September 16, 1998, the jury found Smith guilty of capital murder. The penalty phase began the next day.

### III. PENALTY PHASE BEFORE THE JURY

#### A.    The State's Evidence

In the penalty phase, the State presented evidence that established three statutory aggravating factors: (1) Smith committed the capital offense while under a sentence of imprisonment, see Ala. Code § 13A-5-49(1); (2) Smith committed the capital offense while engaged in the commission of a robbery, see id. § 13A-5-49(4); and (3) the murder of Van Dam was especially heinous, atrocious, or cruel, see id. § 13A-5-49(8).

As to the first aggravating factor, the State called Betty Teague, the director of the Alabama Department of Corrections' central records office. Teague testified that Smith was in the custody of the Alabama Department of Corrections and placed on "prediscretionary leave" on November 21, 1997—two days before Van Dam's murder. Smith was still under a sentence of imprisonment during that leave, including the date of Van Dam's murder.

---

[2]Smith chose not to testify, and the defense rested without calling any witnesses.

6

As to the second aggravating factor, the trial judge noted the jury's verdict established that the capital offense was committed during the course of a robbery.

As to the third aggravating factor of a heinous murder, the State recounted the trial evidence, including (1) Smith's own statements to the police; (2) Smith's actions kicking and beating the victim; and (3) Dr. Goodin's testimony about the victim's injuries, including eight broken ribs and many internal and external injuries caused by 35 to 45 blows.  The State then rested.

## B.     Defense Evidence

As part of his penalty-phase defense, Smith called a number of witnesses to establish mitigating circumstances, including that the "offense was committed while the defendant was under the influence of extreme mental or emotional disturbance."  See id. § 13A-5-51(2).

Smith first called his mother, Glenda Kay Smith ("Glenda Kay").  Glenda Kay testified that Smith's father, Leo Charles Smith ("Leo Charles") got drunk almost every day and verbally and physically abused Smith.  Leo Charles would "try to whoop" Smith and his brothers "with fan belts or water hoses."

When Smith was about 10 years old, Glenda Kay divorced Leo Charles, and she subsequently married Hollis Luker ("Luker").  Luker got drunk three or four times a week and drank with Smith when Smith was about 16 years old.  Smith and

7

Luker would fight, and Luker once injured Smith's ear by hitting him in the head with a bat-like object.

According to Glenda Kay, Smith had educational problems, including dyslexia. Smith was in special education classes and classes for students with "emotional conflicts."[3]

Smith next called Dr. James F. Chudy ("Dr. Chudy"), a clinical psychologist who met with Smith three times, reviewed his school and jail records, and evaluated Smith. Dr. Chudy described Smith's childhood as "at the least, . . . very abusive, probably tormenting at times, [and] extremely unstable."

After administering a Wechsler Adult Intelligence Scale–Revised (WAIS-R) test,[4] Dr. Chudy found Smith had a "full scale IQ of 72, which placed him at the third percentile in comparison to the general population." Dr. Chudy testified that "there actually is what we call a standard error of measurement of about three or four points. So, you know, taking that into account you could -- on the one hand he could be as high as maybe a 75. On the other hand[, Smith] could be as low as a 69. [Sixty-nine] is considered clearly mentally retarded." Dr. Chudy testified that his findings about Smith's intellect were consistent with the school records Dr.

---

[3]The State did not cross-examine Glenda Kay.

[4]Dr. Chudy also assessed Smith using these diagnostic tools: (1) the Wide Range Achievement Test–Revised 3; (2) the Bender Gestalt Visual-Motor Integration Test; (3) a Rorschach test; (4) the Mooney Problem Checklist; (5) the Minnesota Multiphasic Personality Inventory–2; (6) the Millon Clinical MultiAxial Inventory–III; (7) the Subtle Alcohol Screening Survey Inventory–2; and (8) the Jesness Inventory.

Chudy examined and that "all the scores are very much the same." The defense introduced school records, which indicated Smith at age 12 obtained IQ scores of 74 and 75.

Dr. Chudy also testified that "almost all the time people at this level of IQ, and with [Smith] in particular, what I saw in this testing, he does not look like much of a planner. He's more of a reactor. And I would see him more as a follower than a leader."

As to his learning disorder diagnosis, Dr. Chudy testified that, "in spite of his IQ of 72," Smith "did arithmetic at the kindergarten level, which is a standard score of 45. And in the State of Alabama what meets the criteria for a learning disability is a fifteen point difference between your IQ and your standard score." Accordingly, Smith was "even more limited in math than you would expect," given his IQ score of 72.

Based on Smith's full-scale IQ score of 72, Dr. Chudy diagnosed Smith as having "borderline intellectual functioning." Dr. Chudy stated that an individual functioning in this borderline range has the ability to appreciate the consequences of his actions, though the functioning limitation would "minimize" the appreciation "considerably."[5]

---

[5]Dr. Chudy testified that Smith was not "insane" and that his level of intellectual functioning did not prevent Smith from knowing "right from wrong." Rather, Smith's level of functioning resulted in Smith not "learn[ing] very well or profit[ing] much from experience."

9

Dr. Chudy testified that the "emotionally conflicted" classes in which Smith enrolled were special education classes "for kids that are not adjusting to regular classroom[s]."

Based on his evaluation, Dr. Chudy made these six diagnoses of Smith: (1) major depression, severe without psychotic features; (2) post-traumatic stress disorder; (3) alcohol dependence; (4) learning disorder; (5) schizotypal or anti-social personality disorder; and (6) borderline intellectual function.

On cross-examination, Dr. Chudy testified that Smith did not "think things through" and was "impulsive."  When the State's prosecutor asked whether "there are a lot of folks who have higher IQ's [sic] and don't have all this so-called baggage who are impulsive," Dr. Chudy said there were.  Dr. Chudy testified that his evaluation "did not find a pattern that would show that he had major neurological problems that would be inconsistent with a 72 IQ."  When asked whether "[t]here are people with low IQ's [sic] who are what we call 'streetwise,'" Dr. Chudy assented.

Smith called three more witnesses: two sisters and a neighbor.  His sister, Rebecca Charlene Smith ("Rebecca Charlene"), testified that their step-father Luker drank "all the time" and getting drunk "was an everyday routine for him."  Luker treated the members of her family "[l]ike dirt."  Luker hit Smith on the side

10

of the head with a baseball bat, beat Smith's brother Jason with a 2-by-4 piece of wood, and physically abused their mother Glenda Kay.

Shirley Stacey ("Stacey") was a former neighbor of the Smith family during Glenda Kay's marriage to Luker. Stacey testified that Luker was drunk "just about every day." Stacey saw Luker beat the Smith children "with water hoses or whatever he could grab." On multiple occasions, Glenda Kay brought the Smith children to Stacey's house to escape or avoid Luker. On one occasion, Glenda Kay ran to Stacey's house with the Smith children because Luker "had beat [Glenda Kay] and ripped her clothes and she . . . had to get away from him."

Another sister, Lynn Harrison, testified that their father Leo Charles got drunk "a lot" and was physically abusive toward her brothers. Leo Charles once chased Smith with a garden hose and, on another occasion, tried to hit Smith with a fan belt. Harrison saw Luker abuse Smith in ways similar to those that Leo Charles abused Smith. The Smith children had to "run several times just to get away" from Luker's beatings of Glenda Kay.[6]

## C.    The Jury's Advisory Sentence of Death

The jury returned an advisory verdict recommending that Smith be sentenced to death by electrocution. Eleven jurors voted for a death sentence; one voted for life imprisonment without the possibility of parole.

---

[6]Smith's two sisters and neighbor Stacey did not testify about Smith's intellectual functioning, adaptive abilities, or performance in school. The State did not cross-examine them.

## IV. PENALTY HEARING BEFORE THE TRIAL COURT

### A.    Evidence in Penalty Hearing

On October 16, 1998, the trial court held a penalty hearing.  The trial court admitted evidence of: (1) Smith's 1990 convictions for burglary and theft, (2) a pre-sentence report from the Alabama Board of Pardons and Paroles (the "Alabama Report"), and (3) Dr. Chudy's 1998 report, labeled a "psychological evaluation" of Smith.

For his 1990 convictions, Smith was sentenced to 10 years in prison, released on parole in 1996, and sent back to prison in 1997 when he violated his parole terms.  According to the Alabama Report, Smith was arrested nine times between 1986 and 1997 for suspicion of minor crimes, including harassment (three times), menacing (twice), and disorderly conduct (once).

As to Smith's personal and social history, the Alabama Report stated that Smith "dropped out of school in the eighth grade" when Glenda Kay "withdrew him from school on the recommendation of his teachers who described [Smith] as being disrespectful and disruptive in class."  According to the Alabama Report, Smith "was a slow learner and was placed in special education classes."  Smith "failed both the seventh and eighth grades[,] and all of his grades, with the

12

exception of physical education, were below average." Smith "has had no further education or training since that time."[7]

Dr. Chudy's 1998 report included the following conclusions about Smith's mental health.

Evidence of Competency.[8] The report stated that, during Dr. Chudy's interviews, Smith "was alert and oriented," was "able to recount the charges against him and ultimately what could happen to him if he were found guilty," and "accurately define[d] the role and purposes of all the parties involved in the trial proceedings." Dr. Chudy concluded Smith was mentally competent and capable of assisting his defense attorney.

Evidence of Subaverage Intellectual Functioning. The report stated that Smith took the WAIS-R IQ test, and that he earned a verbal IQ score of 73, a performance IQ score of 72, and a full-scale IQ score of 72. According to Dr. Chudy's report, those full-scale scores "place[d Smith] at the 3rd percentile in comparison to the general population." These scores placed him "in the Borderline range of intelligence[,] which means that he operates between the Low Average and Mentally Retarded range." According to Dr. Chudy, "[a]ctually[,] these scores

_____

[7]In a section titled "Evaluation of Offender," the Alabama Report stated that several people at the motel, where Smith stayed prior to Van Dam's murder, "stated they believe [Smith] has a mental problem." According to the Alabama Report, in early 1997, Smith got into a fight with an elderly man and bit off the tip of one of the elderly man's fingers.

[8]These subheadings are not included in Dr. Chudy's report itself but are created to organize the information in his report.

13

place him at a level closer to those individuals who would be considered mentally retarded."

Evidence of Communication Limitations. Dr. Chudy's report indicated that Smith had some communication problems, but was generally coherent. The report stated that (1) at times, it "was necessary to re-state questions in more elementary forms so that [Smith] could understand them," (2) Smith's "comprehension is limited," and (3) Smith "lacks much insight or awareness into his behavior."

Evidence of Limitations in Daily Functioning. Dr. Chudy's report noted that Smith had "emotional problems, which seem to be largely due to an extremely dysfunctional life . . . [and] compounded by his mental dullness." The report stated that Smith's emotional problems limit his "ability to deal with everyday stresses and demands." Dr. Chudy characterized Smith's state of mind as "indifferent and ineffectual," and concluded that Smith's "thinking [was] not real clear" and that Smith "lacks any direction or goal in life." Dr. Chudy concluded that Smith generally "takes little notice of things around him" and "does not think through things."

Evidence of Deficits in Learning from Experience. Dr. Chudy concluded that Smith's "indifferent and ineffectual" mindset "provides little basis for [Smith] [to act] in a consistently sensible manner or learn[ ] from experience . . . even when it involves bringing on pain to himself or those closest to him." Smith's "thinking

14

is vague" and "easily confused," and he "is often overwhelmed with incomprehensible feelings or impulses that he does not understand." Smith "possesses extremely limited insight and judgment."

Evidence of Social Deficits. Dr. Chudy's report indicated that Smith's "personality functioning is equally dysfunctional." As a result of his emotional problems, Dr. Chudy found, Smith often "withdraws from others" and only "[o]casionally . . . will become desperate enough that he will set out to find people to be with." But "poor judgment causes [Smith] to end up with the wrong people." Dr. Chudy found that Smith had "anger about being rejected and 'getting a raw deal in life.'" "Fortunately, [Smith] has been successful at repressing his anger[,] but there is a down side to that. Sooner or later when his anger builds up, it will come out and it will probably come out explosively." Dr. Chudy concluded that Smith "fails to use good judgment because he never learned how to incorporate successfully into societies [sic] norms."

Evidence of Varied Deficits. Dr. Chudy's report examined the particulars of Smith's WAIS-R test results. The report stated that (1) "Smith displayed major deficiencies in areas related to academic skills"; (2) he "functioned well below average in his recall of learned and acquired information (Information)"; and (3) he "was also quite weak in word knowledge and usage (Vocabulary) and mental mathematical computation (Arithmetic)."

15

Other areas of weakness noted by Dr. Chudy had to do with Smith's social skills. Smith "scored well below average in skills having to do with social reasoning and learning how to respond effectively in social situations (Comprehension)." Smith "also showed a major deficiency in his ability to predict social sequences of action (Picture Arrangement)." Dr. Chudy stated that Smith is "ineffective in problem-solving."

## B. Imposition of a Death Sentence

After considering the evidence and arguments, the state trial judge found that the aggravating circumstances outweighed the mitigating circumstances in this case, accepted the jury's advisory death sentence, and ordered that Smith be put to death by electrocution.[9]

The state trial court found these three aggravating circumstances: (1) Smith committed the capital offense while under a sentence of imprisonment at the time of the offense, Ala. Code § 13A-5-49(1); (2) Smith committed the murder while engaged in the commission of a robbery, id. § 13A-5-49(4); and (3) the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, id. § 13A-5-49(8).

---

[9]In 2002, the Alabama Legislature changed the State's standard method of execution from electrocution to lethal injection. See Ala. Code § 15-18-82.1 (2006 Cumulative Supp.). Those inmates who were sentenced to death and whose certificates of judgment were issued after July 1, 2002, had a time-limited option to elect electrocution instead of death by lethal injection. Id. § 15-18-82.1(b). At oral argument, it was confirmed that Smith did not so choose.

16

The state trial court found that no statutory or non-statutory mitigating circumstances existed.  Specifically, the trial court found (1) the capital offense was not committed while Smith was under the influence of extreme mental or emotional disturbance and (2) Smith "was not mentally or emotionally disturbed" to an "extreme extent" or "to the extent that this mitigating circumstance exists." See id. § 13A-5-51(2).  The trial court reached this conclusion after "carefully review[ing] and weigh[ing] both the report and testimony of Doctor James Chudy, a clinical psychologist, in the context of the facts underlying the offense charged and proven."

## C.    Smith's Direct Appeal

The Alabama Court of Criminal Appeals affirmed Smith's conviction and death sentence.  Smith I, 795 So. 2d at 842.  The Alabama Supreme Court denied Smith's petition for a writ of certiorari.  Ex parte Joseph Clifton Smith, 795 So. 2d 842 (Ala. 2001) (mem.).  The United States Supreme Court denied Smith's petition for a writ of certiorari.  Smith v. Alabama, 534 U.S. 872, 122 S. Ct. 166 (2001).

## V. POST-CONVICTION PROCEEDINGS IN STATE COURT

## A.    2002 Rule 32 Petition

In 2002, Smith filed a pro se petition in the state trial court, seeking post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  After the State objected on timeliness grounds, the state trial court dismissed

17

Smith's Rule 32 petition as untimely.  The Alabama Court of Criminal Appeals affirmed, Smith v. State, 897 So. 2d 1246 (Ala. Crim. App. 2003) (table), and denied rehearing, Smith v. State, 910 So. 2d 831 (Ala. Crim. App. 2004) (table).

In 2004, the Alabama Supreme Court reversed and remanded, holding that Smith's Rule 32 petition was timely.  Ex Parte Joseph Clifton Smith, 891 So. 2d 286 (Ala. 2004).  The Alabama Court of Criminal Appeals remanded the case to the state trial court for further proceedings.  Smith v. State, 891 So. 2d 287 (Ala. Crim. App. 2004).

## B.    2004 Second Amended Rule 32 Petition

In 2004, Smith filed an amended Rule 32 petition for post-conviction relief. After the State moved to dismiss, Smith filed a second amended Rule 32 petition. Both petitions alleged that Smith was intellectually disabled and his death sentence violated the Eighth and Fourteenth Amendments.  Smith requested "a full evidentiary hearing" and funds to present witnesses, experts, and other evidence.

## C.    2005 Dismissal of Second Amended Rule 32 Petition

The State moved to dismiss again.  In 2005, the state trial court dismissed Smith's second amended Rule 32 petition.  The court rejected Smith's Atkins claim without an evidentiary hearing.  The court reviewed the Alabama Supreme Court's decision in Ex parte Perkins, 851 So. 2d 453 (Ala. 2002), which identified three requirements to establish mental retardation "under the broadest definition"

18

of that term: (1) "significantly subaverage intellectual functioning (an IQ of 70 or below)," (2) "significant or substantial deficits in adaptive behavior," and (3) manifestation of the first two elements "during the developmental period (i.e., before the defendant reached age 18)." Id. at 456.

As to Smith's intellectual functioning, the state trial court concluded that (1) "[t]he evidence admitted at Smith's trial refutes any assertion that Smith's intellectual functioning is significantly subaverage," and (2) "Smith proffer[ed] no facts in his second amended Rule 32 petition that would in any way dispute the facts contained in the record." As to Smith's adaptive behavior, the state trial court concluded that the record "indicates [few], if any, deficits in Smith's adaptive functioning."

The state trial court found that Smith was not mentally retarded, rejected his Atkins and other claims, and denied his second amended Rule 32 petition in full.

**D.     Appeal of Dismissal of Second Amended Rule 32 Petition**

In 2008, the Alabama Court of Criminal Appeals affirmed the dismissal of Smith's second amended Rule 32 petition, including his Atkins claim. Smith v. State ("Smith II"), 71 So. 3d 12 (Ala. Crim. App. 2008). As to mental retardation, the Alabama appellate court discussed Atkins; how Atkins left it to the states to define "mental retardation"; and Alabama's three requirements for "mental retardation," identified in Perkins. Id. at 17.

19

Turning to Smith's <u>Atkins</u> claim, the Alabama Court of Criminal Appeals concluded that Smith failed to meet his burden of pleading the facts relied upon in seeking relief, as required by Rule 32.6(b) of the Alabama Rules of Criminal Procedure. See <u>id.</u> at 18–19. The Alabama appellate court found that "[t]he only grounds offered in support" of Smith's claim were his conclusory allegations that he met the three requirements of mental retardation under <u>Atkins</u> and <u>Perkins</u>. <u>Id.</u> at 19.

Alternatively, the Alabama appellate court turned to the merits of Smith's <u>Atkins</u> claim based on the trial evidence. The Alabama appellate court concluded that Smith's mental retardation claim failed on the merits because the trial record shows "Smith does not meet the broadest definition of mentally retarded adopted by the Alabama Supreme Court." <u>Id.</u> The Alabama appellate court reviewed the evidence of Smith's full-scale IQ scores of 74 at age 12 and 72 before trial. <u>Id.</u> at 19–20. The Alabama appellate court noted that Dr. Chudy testified "that[,] because of the margin of error in IQ testing[,] Smith's IQ score could be as high as 75 or as low as 69."[10] <u>Id.</u> at 19. The Alabama appellate court did not apply a "margin of error" to Smith's above-70 IQ scores. <u>Id.</u> at 20.

As to Smith's adaptive behavior, the Alabama appellate court concluded that there was "no indication that Smith had significant defects in adaptive behavior."

---

[10]The Alabama Court of Criminal Appeals referred to the standard error of measurement as a "margin of error."

20

Id. at 20.  The Alabama appellate court recounted evidence of Smith's participation in the murder and other evidence relevant to Smith's adaptive behavior, including his ability to communicate with police and his having a girlfriend.[11]  Id.

The Alabama Supreme Court denied Smith's petition for a writ of certiorari.[12]

## VI. SECTION 2254 PETITION IN FEDERAL COURT

### A.    2005 Petition

In 2005, Smith filed this petition for a writ of habeas corpus in the United States District Court for the Southern District of Alabama, pursuant to 28 U.S.C. § 2254.  In 2006, the district court stayed the § 2254 proceedings pending the Alabama state courts' resolution of Smith's Rule 32 petitions.  In 2011, the district court lifted the stay and granted Smith's motion to amend his § 2254 petition. Smith filed an amended petition on July 25, 2011.

### B.    2011 Amended Petition

Smith's amended § 2254 petition alleged, inter alia, that he is intellectually disabled and his execution would violate the Eighth and Fourteenth Amendments. Smith requested discovery and an evidentiary hearing.

---

[11]In 2009, the Alabama appellate court also denied Smith's application for rehearing.

[12]The Alabama Supreme Court initially granted the writ as to Smith's ineffective-counsel claims, but it denied the writ as to all other claims.  Following more briefing, the Alabama Supreme Court quashed the writ.

21

In the district court, Smith argued that the Alabama Court of Criminal Appeals' decision—rejecting his <u>Atkins</u> claim—was both an unreasonable application of clearly established federal law, <u>see</u> 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts, <u>see</u> <u>id.</u> § 2254(d)(2).

## C.    2013 Order Denying Amended § 2254 Petition

On September 30, 2013, the district court denied Smith's amended § 2254 petition without discovery or an evidentiary hearing.  <u>Smith v. Thomas</u> ("<u>Smith III</u>"), No. CIV.A.05-0474-CG-M, 2013 WL 5446032, at *38 (S.D. Ala. Sept. 30, 2013).  The district court concluded that Smith's <u>Atkins</u> claim was not procedurally defaulted and was properly before the federal habeas court because Smith raised it in his second amended Rule 32 petition.  <u>Id.</u> at *27.  The district court examined the reasonableness of the Alabama appellate court's rejection of Smith's <u>Atkins</u> claim based upon Smith's allegations in his first and second amended Rule 32 petitions and the trial record considered by the state courts.  <u>Id.</u> at *27–29.

The district court concluded that the only evidence of Smith's IQ presented to the state trial court was Dr. Chudy's testimony that Smith's full-scale IQ score was 72 in 1998, and the school records indicating that Smith's IQ scores were 74 and 75 in grade school.  <u>Id.</u> at *28.  The district court agreed with the State's position that Dr. Chudy's finding—that Smith is "in the Borderline range of

22

intelligence[,] which means that he operates between the Low Average and Mentally Retarded range"—establishes that Smith is not mentally retarded and not exempt from the death penalty.  Id.

The district court acknowledged (1) that Dr. Chudy's testified "that, in Smith's case, 'a standard error of measurement of about three or four points' could result in an IQ 'as high as maybe a 75 [or] . . . as low as a 69,'" and (2) the "Flynn effect," which artificially inflates IQ scores.[13]  Id.  The district court, however, observed that the Alabama appellate court had refused to downwardly modify Smith's most recent IQ score of 72 to produce an adjusted score within the mental retardation range of 70 or below.  Id. at *28–29.  The district court concluded that the Alabama appellate court did not unreasonably refuse to apply a "margin of error" to Smith's IQ score of 72 such that his score would be reduced and fall within the "mental retardation range."  Id. at *29.

Because the district court concluded Smith "failed to prove that his intellectual functioning was or is significantly subaverage," it did "not explore whether Smith suffers from deficits in adaptive behavior and whether any such deficits manifested themselves before Smith reached the age of 18."  Id. at *29 n.26.  The district court denied Smith's § 2254 petition as to all claims, id. at *6–

---

[13]The "Flynn effect" is the phenomenon by which "IQ test scores have been increasing over time" because, "as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that assessment instrument increases."  Thomas v. Allen, 607 F.3d 749, 753 (11th Cir. 2010).

26, *29–38, denied Smith a certificate of appealability, id. at *38, and later denied

Smith's motion to reconsider, Smith v. Thomas ("Smith IV"), No. CIV.A.05-0474-

CG-M, 2014 WL 217771, at *5 (S.D. Ala. Jan. 21, 2014).

## D.    Smith's Certificate of Appealability

In 2014, this Court granted Smith a certificate of appealability as to these

three issues:

> 1. Whether the Alabama state courts' procedural ruling—that in his Rule 32 post-conviction pleadings as to his mental retardation claim, Smith failed to comply with the specificity pleading requirements in Rule 32.6(b) of the Alabama Rules of Criminal Procedure—was contrary to or an unreasonable application of Atkins v. Virginia, 536 U.S. 304 (2002)?
>
> 2. Whether the Alabama state courts' merits determination—that Smith did not show significant deficits in adaptive behavior manifested before age 18—is an unreasonable determination of the facts or an unreasonable application of Atkins?
>
> 3. Whether the Alabama state courts' merits determination—that Smith did not show subaverage intellectual functioning—is an unreasonable determination of the facts or an unreasonable application of Atkins?[14]

---

[14]With the benefit of the parties' briefs, oral argument, and our examination of the record, it has become clear that the first issue is also properly a question of whether the Alabama Court of Criminal Appeals' procedural ruling is an unreasonable determination of the facts or an unreasonable application of Atkins.  Accordingly, we sua sponte expand the certificate of appealability ("COA") to address whether the Alabama appellate court's decision, including its Rule 32.6(b) ruling, was based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).  See Dell v. United States, 710 F.3d 1267, 1272 (11th Cir. 2013), cert. denied, 134 S. Ct. 1508 (2014) (noting this Court has "expanded a COA sua sponte on exceptional occasions, even after oral argument"); see also 11th Cir. R. 27-1(g) ("A ruling on a motion or other interlocutory matter, whether entered by a single judge or a panel, is not binding upon the panel to which the appeal is assigned on the merits, and the merits panel may alter, amend, or vacate it.").

24

## VII. STANDARD OF REVIEW

We review <u>de novo</u> a district court's ultimate decision to deny a habeas corpus petition brought by a state prisoner.  <u>McNair v. Campbell</u>, 416 F.3d 1291, 1297 (11th Cir. 2005).  As part of that task, we review the district court's factual findings for clear error, and we review mixed questions of fact and law <u>de novo</u>. <u>Id.</u>

## VIII. AEDPA

### A.    AEDPA Deference

A state prisoner's habeas petition is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  "AEDPA recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights."  <u>Burt v. Titlow</u>, 571 U.S. ___, ___, 134 S. Ct. 10, 15 (2013).  AEDPA thus "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  <u>Id.</u> at ___, 134 S. Ct. at 16.  Indeed, the purpose of AEDPA's amendments to § 2254 "is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction."  <u>Greene v. Fisher,</u> 565 U.S. ___, ___, 132 S. Ct. 38, 43 (2011) (quotation marks omitted).

Accordingly, federal review of final state court decisions under § 2254 is "greatly circumscribed" and "highly deferential." Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011) (en banc) (quotation marks omitted). Where a state court denied a petitioner relief on alternative grounds, AEDPA precludes the petitioner from obtaining federal habeas relief unless he establishes that each and every ground upon which the state courts relied is not entitled to AEDPA deference. See Wetzel v. Lambert, 565 U.S. ___, ___, 132 S. Ct. 1195, 1199 (2012) (stating § 2254 petition at issue should not be granted "unless each ground supporting the state court decision is examined and found to be unreasonable under AEDPA").

**B.    Section 2254(d)(1) & (2)**

As a general rule, a § 2254 state petitioner may not obtain federal habeas relief "with respect to any claim that was adjudicated on the merits" by a state court. 28 U.S.C. § 2254(d). However, a petitioner may avoid that general rule if one of two conditions exist: either (1) that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," id. § 2254(d)(1); or (2) that the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). The

26

petitioner carries the burden of proof under § 2254(d)(1) & (2), and our review is limited to the record before the state court.  Cullen v. Pinholster, 563 U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011).

Pursuant to § 2254(d)(1), the phrase "clearly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Lockyer v. Andrade, 538 U.S. 63, 71, 123 S. Ct. 1166, 1172 (2003) (quotation marks omitted).  A state court's application of federal law is not unreasonable under § 2254(d)(1) "so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S. Ct. 770, 786 (2011) (quotation marks omitted).

As to § 2254(d)(2), "a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).  "We may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." Brumfield v. Cain, 576 U.S. ___, ___, 135 S. Ct. 2269, 2277 (2015) (quotation marks omitted).  The Supreme Court has found a state court's factual finding to be unreasonable where the record before the state

court did not support the factual finding.  See Wiggins v. Smith, 539 U.S. 510, 528–29, 123 S. Ct. 2527, 2539 (2003).

## IX. ALABAMA'S APPLICATION OF ATKINS

In 2002, the United States Supreme Court held in Atkins that the execution of "mentally retarded" individuals violates the Eighth Amendment of the Constitution.  536 U.S. at 321, 122 S. Ct. at 2252.[15]  The Supreme Court pointed out that, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded."  Id. at 317, 122 S. Ct. at 2250.  The Atkins Court, however, left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."  Id. (quotation marks omitted and alterations adopted).

As recounted above, the Alabama Supreme Court in Perkins identified three requirements to establish intellectual disability "under the broadest definition" of mental retardation: (1) "significantly subaverage intellectual functioning (an IQ of 70 or below)," (2) "significant or substantial deficits in adaptive behavior," and (3)

---

[15]Prior to Atkins, Alabama, along with most other states, had not outlawed the execution of intellectually disabled individuals.  See Atkins, 536 U.S. at 314–15 & n.20, 122 S. Ct. at 2248-49 & n.20; id. at 342, 122 S. Ct. at 2261–62 (Scalia, J., dissenting).

28

manifestation of "these problems . . . during the developmental period (i.e., before the defendant reached age 18)." Perkins, 851 So. 2d at 456.[16]

Neither the Alabama legislature nor the Alabama Supreme Court has defined what constitutes "significant or substantial deficits in adaptive behavior." See id. But the Alabama Supreme Court has applied generally the "most common" or "broadest" definition of mental retardation, which reflects "the clinical definitions considered in Atkins." In re Jerry Jerome Smith v. State, No. 1060427, 2007 WL 1519869, at *7 (Ala. May 25, 2007). And "significant or substantial deficits in adaptive behavior" means, under the clinical definitions considered in Atkins, a petitioner must show limitations in two or more of the following applicable adaptive-skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, health and safety, functional academics, leisure, and work." Atkins, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3 (citing the American Association on Mental Retardation and American Psychiatric

---

[16]In Perkins, decided shortly after Atkins, the Alabama Supreme Court noted that Alabama lacked statutorily-prescribed procedures for identifying intellectually disabled individuals and "urge[d] the Legislature to expeditiously develop procedures for determining whether a capital defendant is mentally retarded and thus ineligible for execution." Perkins, 851 So. 2d at 457 n.1. In the absence of a legislative definition, the Alabama Supreme Court continued to apply "the 'most common' or 'broadest' definition of mental retardation, as represented by the clinical definitions considered in Atkins and the definitions set forth in the statutes of other states that prohibit the imposition of the death sentence when the defendant is mentally retarded." In re Jerry Jerome Smith v. State, No. 1060427, 2007 WL 1519869, at *7 (Ala. May 25, 2007).

Association's definitions of mental retardation).[17]  Thus, we use that common clinical definition in considering this case.  Cf. Lane v. State, ___ So.3d ___, ___ No. CR-10-1343, 2013 WL 5966905, at *5 (Ala. Crim. App. Nov. 8, 2013) ("In order for an individual to have significant or substantial deficits in adaptive behavior, he must have concurrent deficits or impairments in . . . at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." (quotation marks omitted)).

## X. ANALYSIS OF SMITH'S CLAIMS

### A.    Rule 32.6(b) Determination

Our first task is to review the Alabama Court of Criminal Appeals' procedural ruling—that Smith failed to meet the pleading requirements of Rule 32.6(b).[18]  The Alabama Court of Criminal Appeals' Rule 32.6(b) ruling was based on its underlying factual determination that "[t]he only grounds offered in support" of Smith's claim were his conclusory allegations that he met the three requirements of intellectual disability under Atkins and Perkins.  See Smith II, 71 So. 3d at 19.

---

[17]The American Association on Mental Retardation is now known as the American Association on Intellectual and Developmental Disabilities.

[18]The parties agree that we should review the decision of the Alabama Court of Criminal Appeals on Smith's Atkins claim.

30

Here, we do not examine whether the petition was sufficient to meet Alabama's pleading requirement.[19]  Rather, our narrow review is only the underlying factual determination about whether Smith's second amended petition recounted any facts at all or only conclusory allegations.

Smith's second amended Rule 32 petition included at least seven factual grounds that support his Atkins claim: (1) there "was testimony at trial that Mr. Smith functioned intellectually at the bottom 3rd percentile of all adults"; (2) "[s]chool records indicate that Mr. Smith never progressed beyond the 5th grade"; (3) when Smith enrolled in a junior high school in Monroe County, "the county board of education classified Mr. Smith as 'Educable Mentally Retarded' (EMR), based on his 'psychological and educational evaluations, academic history, and other pertinent information'"; (4) "even though he was in EMR classes while in the Monroe County school system, [Smith] either failed or performed at the 'D' level in all subjects"; and "testimony at sentencing . . . showed [Smith's] inability to adapt because" (5) "he often acts out impulsively," (6) he "lacks the ability to formulate a pre-meditated plan," and (7) he "acts as a follower in groups" (alterations adopted).  These factual allegations relate to the three requirements of intellectual disability under Perkins: significantly subaverage intellectual

_____

[19]Under Rule 32.6(b), each claim in a petition for post-conviction relief "must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds." Ala. R. Crim. P. 32.6(b).  "A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." Id.

31

functioning, significant or substantial deficits in adaptive behavior, and manifestation before age 18.

In short, the Alabama appellate court's factual determination—that the "only grounds" Smith pled were conclusory allegations that he met each of the three requirements—is unsupported by the record and therefore unreasonable.[20] See Wiggins, 539 U.S. at 528–29, 123 S. Ct. at 2539; cf. Brumfield, 576 U.S. at ___, 135 S. Ct. at 2276–77 (reviewing under § 2254(d)(2) a state court's factual determination that the record included "no evidence" of adaptive impairment).[21]

---

[20]We reach this conclusion based on our review of the state court's factual determination about what was alleged in Smith's second amended Rule 32 petition; by contrast, where a state court accurately identifies what allegations were included in a petition and concludes that those allegations failed to meet a pleading requirement, that is a legal conclusion, which is subject to review under § 2254(d)(1). See Brumfield, 576 U.S. at ___ n.3, 135 S. Ct. at 2277 n.3 ("[W]e subject these determinations to review under § 2254(d)(2) instead of § 2254(d)(1) because we are concerned here not with the adequacy of the procedures and standards the state court applied in rejecting [the petitioner's] Atkins claim, but with the underlying factual conclusions. . . .").

[21]Although not squarely on point, Brumfield is instructive. Following Atkins, the death-sentenced Brumfield amended his state post-conviction petition to raise a mental-retardation claim. 576 U.S. at ___, 135 S. Ct. at 2274. Brumfield alleged that he read at a fourth-grade level and obtained an IQ score of 75. Id. at ___, 135 S. Ct. at 2274–75. The state court dismissed his petition. Id. at ___, 135 S. Ct. at 2275.
     Later, the district court granted Brumfield's § 2254 petition, holding, inter alia, the state court's dismissal was based on an unreasonable determination of the facts. Id. Reversing, the Fifth Circuit held that the state court's dismissal decision did not rest on an unreasonable determination of the facts. Id. at ___, 135 S. Ct. at 2276.
     The United States Supreme Court vacated the Fifth Circuit's opinion and concluded that the state court's dismissal decision was based on two separate factual determinations that were unreasonable. Id. at ___, 135 S. Ct. at 2276–77. First, the state court unreasonably determined that Brumfield's evidence of intellectual functioning precluded him from obtaining an Atkins hearing under Louisiana law. Id. at ___, 135 S. Ct. at 2277–79. Contrary to the state court's decision, Brumfield's proffered IQ score of 75 "was squarely in the range of potential intellectual disability" after accounting for the standard error of measurement. Id. at ___, 135 S. Ct. at 2278.

32

Thus, the Alabama Court of Criminal Appeals' conclusion that Smith failed to meet Rule 32.6(b) was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(2).

## B.    Merits Determination

We must also consider the alternative basis the Alabama appellate court used for its affirmance of the dismissal of Smith's Rule 32 petition: its merits determination that the trial evidence conclusively showed that Smith is not "mentally retarded" and thus his Atkins claim fails.[22] See Crawford, 311 F.3d at 1326. That merits determination was a finding of fact. See Fults v. GDCP Warden, 764 F.3d 1311, 1319 (11th Cir. 2014) ("A determination as to whether a person is mentally retarded is a finding of fact."). We review the Alabama appellate court's merits ruling first on Smith's intellectual functioning and then on Smith's adaptive behavior.

As to Smith's intellectual functioning, we agree with the State that Alabama law generally does not contain a strict IQ cut-off of 70 to establish intellectual

---

Second, the state court unreasonably concluded that Brumfield "presented no evidence of adaptive impairment." Id. at ___, 135 S. Ct. at 2277, 2279. The Supreme Court concluded that the state court's factual determination—that the record failed to raise any question as to Brumfield's impairment in adaptive skills—was unreasonable because "the evidence in the state-court record provided substantial grounds to question Brumfield's adaptive functioning." Id. at ___, 135 S. Ct. at 2280.

[22]In reviewing Smith's intellectual functioning and adaptive behavior, the Alabama Court of Criminal Appeals considered both Smith's first and second amended Rule 32 petitions and the evidentiary record from Smith's trial. Accordingly, we do the same. See Pinholster, 563 U.S. at ___, 131 S. Ct. at 1398.

33

disability.  See Thomas v. Allen, 607 F.3d 749, 757 (11th Cir. 2010) ("There is no Alabama case law stating that a single IQ raw score, or even multiple IQ raw scores, above 70 automatically defeats an Atkins claim when the totality of the evidence (scores) indicates that a capital offender suffers subaverage intellectual functioning.").

But the problem for the State here is that the trial evidence showed that Smith's IQ score could be as low as 69 given a standard error of measurement of plus-or-minus three points.  There was also other trial evidence of deficits in intellectual functioning, including that Smith (1) did arithmetic at a kindergarten level, which was consistent with an IQ of 45; (2) suffered from dyslexia; (3) failed seventh grade and dropped out of school in the eighth grade;[23] (4) struggled to recall learned and acquired information; and (5) was "quite weak in word knowledge and usage."

Despite this trial evidence pointing to significant deficits in Smith's intellectual functioning, and even though the state trial court had not conducted an evidentiary hearing, the Alabama Court of Criminal Appeals held that the record conclusively established Smith was not mentally retarded and could never meet Perkins's intellectual-functioning requirement.  Considering the record evidence before the Alabama Court of Criminal Appeals and the fact that Alabama does not

---

[23]In Smith's second amended Rule 32 petition, he also alleged that school records show he never successfully completed any grade beyond the fifth grade.

employ a strict IQ cut-off score of 70, the factual determination that Smith conclusively did not possess significantly subaverage intellectual functioning was an unreasonable determination of the facts.  See Burgess v. Comm'r, Alabama Dep't of Corr., 723 F.3d 1308, 1319 (11th Cir. 2013) ("We hold that the state court's determination that [the petitioner] is not mentally retarded is an unreasonable determination of fact because it was based upon a combination of erroneous factual findings directly contradicted by the record and a record that was insufficient to support its conclusions."); cf. Brumfield, 576 U.S. at ___, 135 S. Ct. at 2278 ("To conclude, as the state trial court did, that [the petitioner's] reported IQ score of 75 somehow demonstrated that he could not possess subaverage intelligence . . . reflected an unreasonable determination of the facts.").

The Alabama Court of Criminal Appeals also determined conclusively that Smith did not suffer from significant or substantial deficits in adaptive behavior. See Smith II, 71 So. 3d at 20.  This conclusion was similarly based wholly on the Alabama appellate court's factual determination that there was "no indication" from the trial record "that Smith had significant defects in adaptive behavior." See id.; cf. Brumfield, 576 U.S. at ___, 135 S. Ct. at 2276–77 (reviewing under § 2254(d)(2) a state court's factual determination that the record included "no evidence" of adaptive impairment).  In other words, there was no record evidence at all of adaptive-behavior impairment.

Even assuming that a petitioner must show deficits areas that are identified in both of the clinical definitions in Atkins, the Alabama Court of Criminal Appeals' conclusion that the record provided "no indication" that Smith had significant deficits in adaptive behavior was an objectively unreasonable determination of the facts. See Miller-El, 537 U.S. at 340, 123 S. Ct. at 1041. Indeed, the record affirmatively contradicts this conclusion that there was "no indication" of significant deficits in Smith's adaptive behavior. There was evidence in the record before the Alabama Court of Criminal Appeals that would support a fact finding that Smith had significant limitations in at least two of the adaptive skills identified by both clinical definitions: (1) social/interpersonal skills and (2) self-direction.

First, as to social/interpersonal skills, Dr. Chudy concluded that Smith "never learned how to incorporate successfully into [society's] norms." Dr. Chudy classified Smith's "personality functioning" as "dysfunctional," noted that Smith "scored well below average in skills having to do with social reasoning and learning how to respond effectively in social situations," and stated that Smith "showed a major deficiency in his ability to predict social sequences of action." Also relevant to this social-skills inquiry, Dr. Chudy found that Smith's emotional problems limited his "ability to deal with everyday stresses and demands" and caused him to "withdraw[ ] from others." Furthermore, Dr. Chudy concluded that

36

Smith "takes little notice of things around him" and "does not think through things."

Second, as to self-direction, Dr. Chudy concluded that Smith "lacks any direction or goal in life." Dr. Chudy found that Smith's "indifferent and ineffectual" mindset provided "little basis for [Smith] acting in a consistently sensible manner or learning from experience . . . even when it involves bringing on pain to himself or those closest to him." Dr. Chudy also concluded that Smith "is often overwhelmed with incomprehensible feelings or impulses that he does not understand" and "possesses extremely limited insight and judgment." In addition, Smith's Rule 32 petition alleged that Smith (1) is prone to impulsive behaviors, (2) lacks the ability to formulate premeditated plans, and (3) acts as a follower in groups.

Considering all the foregoing, the Alabama Court of Criminal Appeals' finding that there was "no indication that Smith had significant defects in adaptive behavior," Smith II, 71 So. 3d at 20, is unsupported (and, in fact, contradicted) by the record and therefore unreasonable, see Wiggins, 539 U.S. at 528–29, 123 S. Ct. at 2539; cf. Brumfield, 576 U.S. at ___, 135 S. Ct. at 2279–82 (holding a state court's "conclusion that the [trial] record failed to raise any question" as to the petitioner's adaptive behavior was an unreasonable determination of the facts). Accordingly, its merits determination (at the early dismissal stage) as to Smith's

37

adaptive behavior functioning was based on an unreasonable determination of the facts.

**C.    Evidentiary Hearing**

Smith requests that we reverse and remand this case to allow Smith on his own to present an expert witness on his behalf. Smith should be allowed to do that.

Smith also included in his prayer for relief a request for discovery and an evidentiary hearing. Neither he nor the State has fully briefed the propriety or usefulness of discovery or of an evidentiary hearing at this stage of the litigation. Accordingly, we do not decide whether the district court should order discovery or an evidentiary hearing, and we leave that issue for the district court to decide in the first instance.

However, in considering whether to grant Smith discovery or an evidentiary hearing, the district court should note that Dr. Chudy's diagnosis of "borderline intellectual functioning" does not ipso facto preclude Smith from attempting to establish that he is intellectually disabled, especially given Dr. Chudy's testimony about the standard error of measurement applicable to Smith's IQ score of 72. See Burgess, 723 F.3d at 1313, 1322 (ordering the district court to conduct an evidentiary hearing to determine whether the petitioner, who had been diagnosed as "borderline mentally retarded," was intellectually disabled under Alabama law).

38

## XI. CONCLUSION

In conclusion, we reverse and remand for further proceedings consistent with this opinion.  In doing so, we express no opinion as to whether Smith is intellectually disabled.  Upon remand, the district court should consider in the first instance Smith's requests for discovery and an evidentiary hearing.

**REVERSED AND REMANDED.**